[No. S064870. June 5, 2000.]

VICKEY KRAUS et al., Plaintiffs and Respondents, v.
TRINITY MANAGEMENT SERVICES, INC., et al., Defendants and
Appellants.

**COUNSEL**

William B. Boone; The Advani Law Firm, Kelly, Herlihy, Advani & Klein, Mukesh Advani, Reed E. Harvey; Sangster, Mannion & Curfman, Sangster, Mannion & Lowe and Richard M. Sangster for Defendants and Appellants.

Fred J. Hiestand for the Association for California Tort Reform as Amicus Curiae on behalf of Defendants and Appellants.

Gibson, Dunn & Crutcher, Gail E. Lees and Richard D. Gluck for ITT Educational Services, Inc., as Amicus Curiae on behalf of Defendants and Appellants.

Kimball, Tirey & St. John and Theodore C. Kimball for the California Apartment Association as Amicus Curiae on behalf of Defendants and Appellants.

Fred L. Main; Livingston & Mattesich Law Corporation, Carol Livingston and Gene Livingston for the California Chamber of Commerce as Amicus Curiae on behalf of Defendants and Appellants.

Coblentz, Patch, Duffy & Bass, Jeffrey G. Knowles, Keith Evans-Orville and Clifford E. Yin for Metropolitan Life Insurance Company as Amicus Curiae on behalf of Defendants and Appellants.

Severson & Werson, Jan T. Chilton and William L. Stern for California Bankers Association and California Financial Services as Amici Curiae on behalf of Defendants and Appellants.

Phillip E. Stano; Mayer, Brown & Platt, Evan M. Tager, Donald M. Falk and Harold Smith Reeves for American Council of Life Insurance as Amicus Curiae on behalf of Defendants and Appellants.

Manatt, Phelps & Phillips, Robert E. Hinerfeld, Barry S. Landsberg and Terri D. Keville for First Healthcare Corporation as Amicus Curiae on behalf of Defendants and Appellants.

O'Melveny & Myers, Mark Wood and John F. Daum for State Farm Mutual Automobile Insurance Company and State Farm General Insurance Company as Amici Curiae on behalf of Defendants and Appellants.

Horvitz & Levy, David M. Axelrad and Lisa Perrochet for Truck Insurance Exchange as Amicus Curiae on behalf of Defendants and Appellants.

Robie & Matthai, Pamela E. Dunn and Daniel J. Koes for United Services Automobile Association as Amicus Curiae on behalf of Defendants and Appellants.

Stephen L. Collier; Chapman, Popik & White, Susan M. Popik, William B. Chapman and Mark A. White for Plaintiffs and Respondents.

The Cartwright & Alexander Law Firm and Mary E. Alexander for Consumer Attorneys of California as Amicus Curiae on behalf of Plaintiffs and Respondents.

Louise H. Renne, City Attorney (San Francisco), Dennis Aftergut, Chief Assistant City Attorney, Owen J. Clements, Andrew Y. S. Cheng, Jayne C. Lee and Rebecca Bedwell-Coll, Deputy City Attorneys, for the City and County of San Francisco, the City of San Jose, the Counties of Sacramento and San Bernardino and the American Heart Association, California Affiliate as Amici Curiae on behalf of Plaintiffs and Respondents.

Kenneth W. Babcock; Kathleen A. Michon; and Earl Lui for Public Counsel Law Center and Consumers Union of U.S., Inc., as Amici Curiae on behalf of Plaintiffs and Respondents.

Lawrence G. Brown; Lydia Villarreal, Deputy District Attorney (Monterey); and Christopher G. Carpenter, Assistant District Attorney (Alameda) for the California District Attorneys Association as Amicus Curiae.

## OPINION

**BAXTER, J.**—We are asked to decide whether, in an action that is not certified as a class action, but is brought on behalf of absent persons by a private party under the unfair competition law (UCL) (Bus. & Prof. Code, § 17200 et seq.),[1] the court may order disgorgement into a fluid recovery fund, and whether permitting such UCL action denies due process to the defendants. We also address a claim that the Court of Appeal erred in upholding the trial court's construction and application of Civil Code section 1950.5 in this case.

We conclude that disgorgement into a fluid recovery fund is not a remedy available in such representative UCL actions and that Civil Code section 1950.5 does not apply to defendants' nonrefundable security and administrative fees. We also conclude that defendants in this case have not been denied due process.

We shall reverse the judgment of the Court of Appeal.

I

### FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Vickey Kraus and five other individual plaintiffs initiated this action on behalf of themselves and the present and former tenants of

---

[1]Unless otherwise stated, all statutory references are to the Business and Professions Code.

defendants. The action sought declaratory relief, restitution, and civil penalties for allegedly unlawful assessments of nonrefundable tenant charges for pre-lease administrative services, liquidated damages, and security for unpaid rent. The named defendants are Trinity Properties, which owns and leases residential rental properties in the City and County of San Francisco, Trinity Management Services, Inc., which manages and operates those properties, and various individuals who are officers and directors of those entities.

The complaint alleged that plaintiffs were former tenants of properties owned and managed by defendants, each of whom, and all other past and present tenants, had been required to pay $100 as a nonrefundable security and administrative fee at the time they entered into the lease.[2] Those plaintiffs who had terminated their leases and vacated the leased apartments prior to the end of the term had been assessed liquidated damages equal to one month's rent and unpaid rent for the balance of the one-year lease term prior to sublease or re-lease of the apartments. A security deposit equal to one month's rent that each tenant was also required to pay was routinely applied to offset liquidated damages.

The first cause of action asserted a violation of Civil Code section 1950.5, which bans nonrefundable security deposits, and was addressed to defendants' TIER fees, a charge for pre-lease administrative services. The second cause of action asserted that the liquidated damages clause of the leases was void as a penalty banned by Civil Code section 1671, or, in the alternative, should be construed as authorizing termination of the lease prior to its expiration. The third cause of action alleged that defendants had been unjustly enriched to the extent that they had collected the security deposits and liquidated damages in violation of those statutes, and sought restitution of those tenant payments. Finally, the fourth cause of action, that with which we are principally concerned here, alleged that defendants' practice of assessing the TIER fees and their practice of assessing both liquidated damages and the remainder of the rent when tenants terminated their leases before the end of the term were unlawful and unfair business practices that violated the UCL.[3]

Plaintiffs sought (1) an order that defendants repay them and all other present and former tenants the full amount of all TIER fees collected from

---

[2]Defendants identified this charge as a "Tenant Initiation Expense Reimbursement" or TIER fee.

[3]Section 17200 defines unfair competition as "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code."

them, with interest since the date of collection; (2) statutory damages of $600 pursuant to Civil Code section 1950.5, subdivision (k), for each former and present tenant from whom the administrative fee security deposit had been collected; (3) a declaration that the liquidated damages provision of the lease was void or that tenants might elect to treat the liquidated damages as consideration for early termination; (4) an order that defendants return all amounts collected as liquidated damages, or at the tenants' election, all amounts collected as rent for periods following early termination; (5) assessment of a civil penalty of $2,500 for each violation of the UCL;[4] (6) an order that defendants cease the allegedly unlawful practices; and (7) attorney fees as well as any other appropriate relief.

At a pretrial hearing the court commented that disgorgement, rather than recovery for all injured persons, seemed to be the remedy authorized by the UCL, and that a defendant should disgorge profits obtained as a result of an unfair business practice. Plaintiffs' counsel concurred that equitable remedies of restitution or disgorgement were authorized, but argued that if there was to be disgorgement the monies should be paid to the tenants and former tenants from whom they had been obtained. He offered to submit a supplemental brief on the appropriate remedy if it was not possible to locate some of those people, but also agreed that the essential form of recovery was equitable and restitutionary in nature and should begin with disgorgement of the funds unlawfully collected. Counsel's opening statement then identified rescission or disgorgement as the relief sought on the UCL cause of action. Plaintiffs' counsel subsequently advised that he would propose equitable remedies beyond those identified in the complaint and asked that the court order disgorgement of the entire amount of the TIER fees and improperly retained liquidated damages/security deposit funds. Counsel also suggested that, to the extent that restitution could not be made to individual plaintiffs, defendants be ordered to disgorge the money unjustly collected to a fluid recovery fund.

The court found that the challenged practices violated the cited provisions of the Civil Code and constituted unfair business practices that violated the UCL. The court enjoined defendants from assessing TIER fees or any other nonrefundable charges as a condition of tenancy, collecting and retaining security deposits for the purpose of charging them against liquidated damages, and including liquidated damages provisions in the lease. It ordered Trinity Properties to disgorge $447,700 for liquidated damage/security fee

---

[4]The trial court sustained defendants' demurrer to this paragraph of the complaint.

assessments[5] and Trinity Management Services, Inc., to disgorge $447,000 of TIER fees, the sums collected within the four-year statute of limitations period of April 6, 1990, through February 28, 1995, with interest at 6 percent per annum. After awarding a total of $2,655 in TIER and security deposit money to plaintiffs, the judgment directed that defendant Trinity Management Services, Inc., "shall on the date of this order and for a period of 90 days thereafter, pay to each payor of the $100 TIER fee the sum of $100 as restitution. Such payments shall be made to those persons who may, with due diligence, be found. Restitution made in accordance with this provision shall be deducted from the amount required for disgorgement." The court made no express order for restitution to prior tenants of any of the liquidated damage/security fee sums to be disgorged.[6]

The judgment directed that the funds disgorged be placed in a fluid recovery fund. That fund was to be organized and administered as a trust fund "for the purpose of providing financial assistance for the advancement of legal rights and interests of residential tenants in the City and County of San Francisco." The order for fluid recovery was made over the express objection of defendants that the remedy was available only in a class action. Defendants also objected that no award could be made to persons who were not parties to the action.

Defendants appealed, claiming, inter alia, that the fluid recovery fund award in a matter not certified as a class action exceeded the jurisdiction of the court. They also claimed that the order denied defendants due process because the award left defendants open to repeated litigation by nonparties who would not be bound by the judgment.[7] They also argued that the TIER fees were not unlawful and that collateral estoppel barred plaintiffs' assertion of illegality.

The Court of Appeal held that section 17203 authorizes an order for disgorgement and/or restitution as relief ancillary to an injunction against an

---

[5]The court found that the average liquidated damages charge was $700. A security deposit in the amount of one month's rent required of each tenant was routinely used to secure payment of the liquidated damages amount.

[6]The second step of the procedure for implementation of fluid recovery, as described in both *Granberry v. Islay Investments* (1995) 9 Cal.4th 738, 750, footnote 7 [38 Cal.Rptr.2d 650, 889 P.2d 970], and *State of California v. Levi Strauss & Co.* (1986) 41 Cal.3d 460, 472 [224 Cal.Rptr. 605, 715 P.2d 564], both class action cases, permits class members to collect their share of the recovery. The judgment in this case does not expressly provide for any restitution of liquidated damage/security fee payments to tenants.

[7]Defendants also argued that the court erred in finding that the liquidated damages clause of the lease was unlawful, denying setoffs, and awarding interest. No issues related to these claims are before this court.

unfair trade practice, and that provision for payment into a fluid recovery fund is within the equitable power of the court regardless of whether the action is one by a private party or one by the Attorney General or a district attorney. The court did not address defendants' due process claims, holding only that through the UCL the Legislature had created a streamlined procedure by which to challenge unfair business practices, and that this case was not one in which a class action would be preferable.[8] The court approved establishment of a fluid recovery fund in a representative UCL action as a permissible exercise of the broad equitable power granted to the trial court by section 17203, relying in part on *Fletcher v. Security Pacific National Bank* (1979) 23 Cal.3d 442, 450 [153 Cal.Rptr. 28, 591 P.2d 51] (*Fletcher*), where this court commented on the importance of disgorgement as a deterrent. The Court of Appeal acknowledged that class actions might be superior to individual actions in circumstances such as those considered by the Court of Appeal in *Bronco Wine Co. v. Frank A. Logoluso Farms* (1989) 214 Cal.App.3d 699 [262 Cal.Rptr. 899] (*Bronco Wine Co.*), but deemed the issue before it to be simply whether the trial court should have certified the action as a class action.[9] Finding the circumstances in the instant case to be more analogous to those in one of its prior cases, *Dean Witter Reynolds, Inc. v. Superior Court* (1989) 211 Cal.App.3d 758 [259 Cal.Rptr. 789], the Court of Appeal concluded that the trial court was not required to certify this action as a class action before ordering disgorgement into a fluid recovery fund.

The court also rejected defendants' argument that a 1983 judgment upholding the TIER fee collaterally estopped plaintiffs from challenging the fee in this action, reasoning that an intervening change in the law removed that barrier. It then held that the TIER fee was a security within the meaning of Civil Code section 1950.5, and that since Trinity Management Services, Inc., collected the fee on behalf of Trinity Properties, that section applied to the TIER fee.

Defendants petitioned this court for review. Their principal claim is that the Court of Appeal erred in approving disgorgement into a fluid recovery

---

[8]A petition for rehearing pointing out this omission (see Cal. Rules of Court, rule 29(b)(2)) was denied.

[9]The action was not instituted as a class action. Only paragraph 27, in the cause of action for unfair business practices, indicated that relief was sought on behalf of absent persons. That paragraph stated: "Plaintiffs allege this claim on behalf of themselves and all other present and former tenants of the defendants who have been subject to these unlawful and unfair business acts and practices." As noted earlier, defendants had argued in the trial court that a representative UCL action was not authorized and that class action procedures were required if plaintiffs were to recover on behalf of persons who were not parties to the action.

fund without class action certification. Their due process-based argument that such awards are constitutionally impermissible rests on the proposition that absent persons are not bound by a UCL judgment unless the judgment is rendered in a class action with its attendant protections. Absent class certification, the defendant in such an action remains subject to countless future lawsuits based on the same conduct and raising the same issues even if the defendant has prevailed in the UCL action. If the plaintiff prevails, the defendant is still liable to all of the nonjoined class members, each of whom is entitled to a similar fund award. This, defendants argue, denies due process to UCL defendants.

Several amici curiae, among them the American Council of Life Insurance (ACLI) and Truck Insurance Exchange, suggest that we need not address the constitutional argument because, properly construed, the UCL does not authorize fluid recovery or representative actions seeking restitutionary relief on behalf of absent persons without class certification.

## II

### UCL MONETARY REMEDIES

Both consumer class actions and representative UCL actions[10] serve important roles in the enforcement of consumers' rights. Class actions and representative UCL actions make it economically feasible to sue when individual claims are too small to justify the expense of litigation, and thereby encourage attorneys to undertake private enforcement actions. Through the UCL a plaintiff may obtain restitution and/or injunctive relief against unfair or unlawful practices in order to protect the public and restore to the parties in interest money or property taken by means of unfair competition. These actions supplement the efforts of law enforcement and regulatory agencies. This court has repeatedly recognized the importance of these private enforcement efforts. (See *La Sala v. American Sav. & Loan Assn.* (1971) 5 Cal.3d 864, 883 [97 Cal.Rptr. 849, 489 P.2d 1113]; *Vasquez v. Superior Court* (1971) 4 Cal.3d 800, 807-808 [94 Cal.Rptr. 796, 484 P.2d 964, 53 A.L.R.3d 513]; *Daar v. Yellow Cab Co.* (1967) 67 Cal.2d 695, 715 [63 Cal.Rptr. 724, 433 P.2d 732].)

In our ensuing discussion of the UCL, when we refer to orders for restitution, we mean orders compelling a UCL defendant to return money

[10]"[A]ny person acting for the interests of itself, its members or the general public," as well as specified public officials, may seek UCL relief on behalf of the general public. (§ 17204.) We use the term "representative action" to refer to a UCL action that is not certified as a class action in which a private person is the plaintiff and seeks disgorgement and/or restitution on behalf of persons other than or in addition to the plaintiff.

obtained through an unfair business practice to those persons in interest from whom the property was taken, that is, to persons who had an ownership interest in the property or those claiming through that person.[11] An order that a defendant disgorge money obtained through an unfair business practice may include a restitutionary element, but is not so limited. As in this case, such orders may compel a defendant to surrender all money obtained through an unfair business practice even though not all is to be restored to the persons from whom it was obtained or those claiming under those persons. It has also been used to refer to surrender of all profits earned as a result of an unfair business practice regardless of whether those profits represent money taken directly from persons who were victims of the unfair practice.

■ "The term 'fluid recovery' refers to the application of the equitable doctrine of *cy près* in the context of a modern class action. (*State of California v. Levi Strauss & Co.*[, *supra*,] 41 Cal.3d 460, 472. . . .) 'The implementation of fluid recovery involves three steps. [Citation.] First, the defendant's total damage liability is paid over to a class fund. Second, individual class members are afforded an opportunity to collect their individual shares by proving their particular damages, usually according to a lowered standard of proof. Third, any residue remaining after individual claims have been paid is distributed by one of several practical procedures that have been developed by the courts.' (*Id.* at pp. 472-473.)" (*Granberry v. Islay Investments*, *supra*, 9 Cal.4th at p. 750, fn. 7.)

*Authority for Fluid Recovery.*

■ We have not been asked before to consider whether a fluid recovery remedy, a remedy that is necessary only when a defendant must disgorge money that is not to be returned to the persons from whom they were obtained, is authorized by the UCL. Heretofore, this court has sanctioned fluid recovery only in class actions, although two Court of Appeal decisions have approved its use in representative UCL actions. (See *People v. Thomas Shelton Powers, M.D., Inc.* (1992) 2 Cal.App.4th 330 [3 Cal.Rptr.2d 34] (*Powers*); *People ex rel. Smith v. Parkmerced Co.* (1988) 198 Cal.App.3d 683 [244 Cal.Rptr. 22] (*Parkmerced*).) Fluid recovery developed as a means by

---

[11]Section 17203 authorizes the court to make orders necessary to restore real or personal property and money "to any person in interest." The Legislature has used the term "person in interest" repeatedly in contexts that confirm this understanding of its meaning. (See, e.g., §§ 17535, 19214; see also Code Civ. Proc., § 873.810; Pub. Resources Code, § 25966.) Code of Civil Procedure section 1235.125 provides further: "When used with reference to property, 'interest' includes any right, title, or estate in property." "Interests in Property" are described in Civil Code sections 678 through 703.

which to distribute the residue of a favorable class action judgment remaining after payment to those class members who have sufficient interest in obtaining recovery and can produce the documentation necessary to file individual claims.

■ In *Bruno v. Superior Court* (1981) 127 Cal.App.3d 120, 123-124 [179 Cal.Rptr. 342], a Cartwright Act (§ 16700 et seq.) class action seeking damages on behalf of consumers, the court explained the purpose of fluid recovery: "The theory underlying fluid class recovery is that since each class member cannot be compensated exactly for the damage he or she suffered, the best alternative is to pay damages in a way that benefits as many of the class members as possible and in the approximate proportion that each member has been damaged, even though, most probably, some injured class members will receive no compensation and some people not in the class will benefit from the distribution; or, as one commentator states it, 'where funds cannot be delivered precisely to those with primary legal claims, the money should if possible be put to the "next best" use.' (Note, *Developments in the Law-Class Actions* (1976) 89 Harv.L.Rev. 1318, 1522.)"

The Legislature authorized employment of a fluid recovery remedy in class actions by the 1993 enactment of what is now Code of Civil Procedure section 384 (Stats. 1993, ch. 863, § 2, p. 4574).[12] However, the Legislature has not expressly authorized fluid recovery in UCL actions, where restitution to a person in interest is the only monetary remedy for violation of the UCL described in section 17203.

Section 17203 provides that remedy and reads in its entirety: "Any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction. The *court may make such orders* or judgments, including the appointment of a receiver, as may be

---

[12]Code of Civil Procedure section 384 now provides, in relevant part: "(a) It is the intent of the Legislature in enacting this section to ensure that the unpaid residuals in class action litigation are distributed, to the extent possible, in a manner designed either to further the purposes of the underlying causes of action, or to promote justice for all Californians. . . . [¶] (b) Except as provided in subdivision (d), prior to the entry of any judgment in a class action established pursuant to Section 382, the court shall determine the total amount that will be payable to all class members, if all class members are paid the amount to which they are entitled pursuant to the judgment. The court shall also set a date when the parties shall report to the court the total amount that was actually paid to the class members. After the report is received, the court shall amend the judgment to direct the defendant to pay the sum of the unpaid residue, plus interest on that sum at the legal rate of interest from the date of entry of the initial judgment, in any manner the court determines is consistent with the objectives and purposes of the underlying cause of action, including to child advocacy programs and to the California Legal Corps . . . ."

necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, as defined in this chapter, or *as may be necessary to restore to any person in interest any money* or property, real or personal, *which may have been acquired by means of such unfair competition.*" (Italics added.) Thus, restitution is the only monetary remedy expressly authorized by section 17203.

We first address the statutory construction argument of amici curiae.

█ If the language of a statute is clear and unambiguous, judicial construction is not necessary and a court should not indulge in it. (*People v. Fuhrman* (1997) 16 Cal.4th 930, 937 [67 Cal.Rptr.2d 1, 941 P.2d 1189].) The statutory authorization in section 17203 to make orders necessary to restore money to any person in interest is clear. When restitution is made to a person in interest, fluid recovery is unnecessary. Section 17203 also grants the court the power to make orders necessary to prevent the use of unfair business practices. Such orders may encompass broader restitutionary relief, including disgorgement of all money so obtained even when it may not be possible to restore all of that money to direct victims of the practice. However, the Legislature has not accompanied that grant of power with authorization for fluid recovery in representative UCL actions.

█ A first principle of statutory construction is that the intent of the Legislature is paramount. (Code Civ. Proc., § 1859.) The court's role in construing a statute is to ascertain the intent of the Legislature so as to effectuate the purpose of the law and, in doing so, the court looks first to the words of the statute. (*People v. Birkett* (1999) 21 Cal.4th 226, 231 [87 Cal.Rptr.2d 205, 980 P.2d 912].) If the language is ambiguous, we may look to the history and background of the statute to ascertain legislative intent. (*Id.* at p. 232.) Also, a court must, whenever possible, construe a statute so as to preserve its constitutional validity. (*Hutnick v. United States Fidelity & Guaranty Co.* (1988) 47 Cal.3d 456, 466 [253 Cal.Rptr. 236, 763 P.2d 1326]; *People v. Davenport* (1985) 41 Cal.3d 247, 264 [221 Cal.Rptr. 794, 710 P.2d 861].) We presume that the Legislature understands the constitutional limits on its power and intends that legislation respect those limits.

Nothing in the history of the UCL suggests that fluid recovery was contemplated by the UCL itself. The UCL evolved from a 1933 amendment to Civil Code section 3369. As enacted in 1872, that statute provided only: "Neither specific nor preventive relief can be granted to enforce a penal law, except in a case of nuisance, nor to enforce a penalty or forfeiture in any case." In 1933, the section was extensively rewritten. The original provision

became subdivision 1, which itself was amended to add a second exception to the limit on injunctive relief—one for unfair competition. Express authority to enjoin unfair competition was created in subdivision 2. Unfair competition was defined in subdivision 3 as an "unfair or fraudulent business practice and unfair, untrue or misleading advertising and any act denounced by Penal Code sections 654a, 654b or 654c." (Stats. 1933, ch. 953, § 1, p. 2482.) Subdivision 5 included a person acting in the interest of the general public among the persons authorized to bring an action for an injunction. (Stats. 1933, ch. 953, § 1, p. 2482.)

Notwithstanding the broadly worded definition of unfair competition, the law was not relied on as the basis of general consumer protection actions until the late 1950's. Even then, however, the law was relied on principally by public prosecutors until *Barquis v. Merchants Collection Assn.* (1972) 7 Cal.3d 94 [101 Cal.Rptr. 745, 496 P.2d 817], a case brought by private plaintiffs, confirmed the breadth of the definition of unfair competition and the availability of the action for injunctive relief to private plaintiffs. (See Howard, *Former Civil Code Section 3369: A Study in Judicial Interpretation* (1979) 30 Hastings L.J. 705.)

Express statutory authority to order restitution was added to Civil Code section 3369, the predecessor to section 17203, in 1976 (Stats. 1976, ch. 1005, § 1, p. 2378), the year before the unfair competition law was placed in the Business and Professions Code and removed from Civil Code section 3369. (Stats. 1977, ch. 299, §§ 1, 2, pp. 1202-1203.)[13]

ACLI argues that the language and history of section 17203 suggest that the Legislature did not intend to permit orders directing disgorgement into a

---

[13]In 1976, Civil Code section 3369, as amended, provided: "1. Neither specific nor preventative relief can be granted to enforce a penalty or forfeiture in any case, nor to enforce a penal law, except in a case of nuisance or unfair competition.

"2. Any person performing or proposing to perform an act of unfair competition within this state may be enjoined in any court of competent jurisdiction. The court may make such orders or judgments, including the appointment of a receiver, as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, as defined in this section, or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition.

"3. As used in this section, unfair competition shall mean and include unlawful, unfair or fraudulent business practice and unfair, deceptive, untrue or misleading advertising and any act denounced by Business and Professions Code Sections 17500 to 17535, inclusive.

"4. As used in this section, the term person shall mean and include natural persons, corporations, firms, partnerships, joint stock companies, associations and other organizations of persons.

"5. Actions for injunction under this section may be prosecuted by the Attorney General or any district attorney or any city attorney of a city having a population in excess of 750,000 . . . ."

fluid recovery fund or actions seeking restitution to any person other than a direct victim of unfair competition.[14] It notes that traditionally only injunctive relief was available in a UCL action. Before the Legislature added express power to order restitution to the false advertising law (§ 17500 et seq.) in a 1972 amendment to section 17535 (Stats. 1972, ch. 244, § 1, p. 494) and to the UCL in 1976, restitution had been judicially approved as a proper exercise of the equitable power granted by section 17535[15] in *People v. Superior Court* [(*Jayhill*)] (1973) 9 Cal.3d 283 [107 Cal.Rptr. 192, 507 P.2d 1400, 55 A.L.R.3d 191] (*Jayhill*), an action brought by the Attorney General. When the *Jayhill* action was initiated, section 17535 did not expressly authorize an order for restitution. We held nonetheless that "a court of equity may exercise the full range of its inherent powers in order to accomplish complete justice between the parties, restoring if necessary the *status quo ante* as nearly as may be achieved." (*Jayhill, supra,* 9 Cal.3d at p. 286.) We did not consider whether disgorgement into a fluid recovery fund was authorized. We held only that the court had the power to order defendants to make or offer to make restitution to defrauded customers. (*Ibid.*)

---

"6. Unless otherwise expressly provided, the remedies or penalties provided by this section and Section 3370.1 are cumulative to each other and to the remedies or penalties available under all other laws of this state." (Stats. 1976, ch. 1005, § 1, pp. 2378-2379.)

When the UCL was adopted in 1977, these provisions became sections 17200-17205. (Stats. 1977, ch. 299, § 1, p. 1202 et seq.)

[14]Amicus curiae California District Attorneys Association argues that the court has inherent power to order disgorgement and that the court should be free to determine in the individual representative UCL action by a private party whether to order disgorgement/restitution and payment into a fluid recovery fund, or to require that the action proceed as a class action. The court's inherent equitable power may not be exercised in a manner inconsistent with the legislative intent underlying a statute, however. (See *Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 967 [67 Cal.Rptr.2d 16, 941 P.2d 1203]; *Bauguess v. Paine* (1978) 22 Cal.3d 626, 637-638 [150 Cal.Rptr. 461, 586 P.2d 942].) Except where legislative action impinges on the exercise of fundamental judicial powers and thus violates the separation of powers doctrine (Cal. Const., art. III, § 3), a statute may specify the remedy and/or relief available for violation of the statute and thereby limit the extent of equitable relief a court may grant.

[15]Section 17535: "Any person, corporation, firm, partnership, joint stock company, or any other association or organization which violates or proposes to violate this chapter may be enjoined by any court of competent jurisdiction. The court may make such orders or judgments, including the appointment of a receiver, as may be necessary to prevent the use or employment by any person, corporation, firm, partnership, joint stock company, or any other association or organization of any practices which violate this chapter, or which may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of any practice in this chapter declared to be unlawful.

"Actions for injunction under this section may be prosecuted by the Attorney General or any district attorney, county counsel, city attorney, or city prosecutor in this state in the name of the people of the State of California upon their own complaint or upon the complaint of any board, officer, person, corporation or association or by any person acting for the interests of itself, its members or the general public."

When express authority to order restitution was added to section 17535 and subsequently to what became section 17203, therefore, there was no authority for an order directing disgorgement on behalf of third parties into a fluid recovery fund in a UCL action. Although the *cy près* concept of putting charitable trust funds to the next best use if the trust purpose can no longer be accomplished was well established and has been expressly authorized by the Legislature (Prob. Code, § 15409), the extension of that equitable concept to other areas of civil litigation is a relative recent judicial development of the law which the Legislature has approved only for use in class actions. Fluid recovery in class actions was not authorized in this state until 1981, when the Court of Appeal held in *Bruno v. Superior Court, supra*, 127 Cal.App.3d 120, that this was a permissible means of distributing damages recovered in a state antitrust class action brought under the Cartwright Act (§ 16700 et seq.). In 1986, this court affirmed the propriety of fluid recovery in a class action in *State of California v. Levi Strauss & Co., supra*, 41 Cal.3d 460. The Legislature responded in 1993 by enacting former section 383 of the Code of Civil Procedure, to expressly authorize fluid recovery in class actions. (Stats. 1993, ch. 863, § 2, p. 4574; see now Code Civ. Proc., § 384.) The Legislature did not sanction fluid recovery orders as an equitable power available to the court in other proceedings.

Plaintiffs have directed us to nothing, and we have found nothing, in the legislative history of sections 17203 and 17535 to suggest that the Legislature intended to authorize fluid recovery in representative UCL actions when it made the power to order restitution statutory. As we observed in *Fletcher*, *supra*, 23 Cal.3d at page 453, footnote 6, and in *Jayhill*, *supra*, 9 Cal.3d at page 287, footnote 1, the Legislature added express power to order restitution to section 17535 only to clarify the law, not to create new authority. Section 17203 simply tracked the language of section 17535. In both of those sections the Legislature confirmed, but did not increase, the powers of the court in a UCL action.

Nor can we infer that the Legislature contemplated that authority to order disgorgement into a fluid recovery fund would be an appropriate complement to the Federal Trade Commission Act (15 U.S.C. § 45 et seq.) (FTC Act). Both laws prohibit a wide range of unfair practices, but the FTC Act has no private enforcement provision comparable to the UCL. The FTC Act may be enforced only by the Federal Trade Commission. (*Holloway v.*

*Bristol-Myers Corporation* (D.C. Cir. 1973) 485 F.2d 986, 1002 [158 App.D.C. 207] (*Holloway*).)[16]

The Court of Appeal here reasoned that the trial court, in the exercise of its broad equitable power, had authority to order defendants to disgorge all illegally obtained money into a fluid recovery fund, the residue of which, after refund of the TIER fees, would be used for purposes other than restitution to present and former tenants of defendants. However, this court has never construed section 17203 as authorizing an order for disgorgement into a fluid recovery fund, or held that such an order may be made as an exercise of the court's equitable power. In the past, authority for fluid recovery has not been found in the UCL or the powers it grants the court. Authority to order fluid recovery has its source in the powers of the court when presiding over a class action, as now expressly confirmed in Code of Civil Procedure section 384.

*Fletcher, supra,* 23 Cal.3d 442, does not suggest otherwise. *Fletcher* was an action brought under section 17500, banning false or deceptive advertising, and section 17535. The plaintiff, a borrower, alleged that a banking industry practice of computing interest on the basis of a 360-day year constituted an unfair trade practice.

The principal issue in *Fletcher* was whether the trial court had abused its discretion in ruling that the action could not be maintained as a class action

---

[16]As the court explained in *Holloway*, rejecting a claim that consumers and members of the public at large had standing to enforce the FTC Act, Congress was aware that the breadth of unfair practices that might be subject to the FTC Act required a coherent enforcement regime: "[T]his breadth of prohibition carried with it a danger that the statute might become a source of vexatious litigation. Expertise was called for . . . to avoid using the statute as a vehicle for trivial or frivolous claims. There was, furthermore, a need to develop a central and coherent body of precedent, construing and applying the statute in a wide range of factual contexts, so as to define its operative reach. Finally, it would be of assistance to create a specialized forum where businessmen whose methods had been called into question could voluntarily revise their practices without the need to resort to the courts." (*Holloway, supra,* 485 F.2d at p. 990, fns. omitted.)

Congress also foresaw that private enforcement actions could impose unwarranted burdens on defendants. In exercising its enforcement discretion, the Federal Trade Commission could consider the relative seriousness of a violation and the effect an enforcement proceeding would have on the public and commercial relationships. It could also consider whether to act against an individual party or on an industrywide basis, what type of action to take, what remedy to seek, and other factors. "Above all, there is [a] need to weigh each action against the Commission's broad range policy goals and to determine its place in the overall enforcement program of the FTC. [¶] Private litigants are not subject to the same constraints. They may institute piecemeal lawsuits, reflecting disparate concerns and not a coordinated enforcement program. The consequence would burden not only the defendants selected but also the judicial system. It was to avoid such possibilities of lack of coherence that Congress focused on the FTC as an exclusive enforcement authority." (*Holloway, supra,* 485 F.2d at pp. 997-998, fns. omitted.)

because individual issues—whether each individual claimant was aware of the fraud—predominated over common questions. We distinguished a UCL claim from claims based on breach of contract or fraud, and held that once an unfair trade practice was established, a class action could proceed without individualized proof of lack of knowledge of the fraud. The court concluded that the language of section 17535 reflected legislative intent "to vest the trial court with broad authority to fashion a remedy that would effectively 'prevent the use . . . of any practices which violate [the] chapter [proscribing unfair trade practices]' and deter the defendant, and similar entities, from engaging in such practices in the future. The requirement that a wrongdoing entity disgorge improperly obtained moneys surely serves as the prescribed strong deterrent." (*Fletcher, supra,* 23 Cal.3d at p. 450.)

Rejecting a claim that the statutory authority to make orders necessary to restore money "which may have been acquired" through an unlawful practice required proof of each transaction in order to determine that each claimant had been defrauded, we also held that section 17535 authorized a court to order restitution without showing the individual's lack of knowledge of the fraudulent practice in each transaction. (*Fletcher, supra,* 23 Cal.3d at pp. 450, 452.) We had no occasion to consider whether an order for disgorgement into a fluid recovery fund was authorized by section 17203.

As noted earlier, fluid recovery in a class action was approved by the Court of Appeal in *Bruno v. Superior Court, supra,* 127 Cal.App.3d 120, a private antitrust class action brought to recover damages for excessive milk prices. There the court cautioned that the law under which a damage action is brought might preclude fluid recovery (*id.* at p. 130), but held that the Cartwright Act did allow that remedy. The court rejected an argument that section 16750, subdivision (a) precluded fluid recovery because the law authorized a person injured by reason of a forbidden practice to sue for and recover only the damages that person suffered, and fluid recovery would permit recovery by persons who had not sustained damages. Reasoning that *damages* are recovered by the recovery of a judgment, not through subsequent distribution of the money, the court concluded that the only persons who would recover damages were the class members in whose favor judgment was entered, i.e., the class of consumer victims. (127 Cal.App.3d at p. 131.) The court also held that the antitrust law did not reflect an intent that no damages could be recovered except those to be distributed to the persons injured, and found legislative sanction for fluid recovery in section 16760, subdivision (c), which governed distribution of damages recovered in *parens patriae* actions brought by the Attorney General. Section 16760 provides for escheat to the state of any residue after individual claims, costs, and attorney fees were satisfied, and thus sanctions one form of fluid recovery.

In *State of California v. Levi Strauss & Co., supra,* 41 Cal.3d 460 (*Levi Strauss*),[17] in which this court approved fluid recovery in class actions, the Attorney General had sued the defendant clothing manufacturer on behalf of the state and consumers who allegedly had been overcharged for jeans in violation of the Cartwright Act. (§ 16700 et seq.) Pursuant to the settlement consumers were to be notified of their right to claim a refund from a $12.5 million settlement fund. The issue addressed by this court was how to distribute the residue remaining after costs of distribution, attorney fees, and individual claims were paid. The appellant, an intervener, and amici curiae proposed establishment of a consumer trust fund.

This court first cautioned that "[t]he propriety of fluid recovery in a particular case depends upon its usefulness in fulfilling the purposes of the underlying cause of action. [Citations.] Fluid recovery may be essential to ensure that the policies of disgorgement or deterrence are realized. [Citation.] Without fluid recovery, defendants may be permitted to retain ill gotten gains simply because their conduct harmed large numbers of people in small amounts instead of small numbers of people in large amounts." (*Levi Strauss, supra,* 41 Cal.3d at p. 472.) We then reviewed the various alternative means of distributing damages recovered in consumer class actions—price rollbacks, earmarked escheat, general escheat, consumer trust fund, and division among the individual claimants—noting that the choice was within the sound discretion of the trial court. We emphasized that, in selecting the fluid recovery procedure, a court should consider "(1) the amount of compensation provided to class members, including nonclaiming (or 'silent') members; (2) the proportion of class members sharing in the recovery; (3) the extent to which benefits will 'spill over' to nonclass members and the degree to which the spillover benefits will effectuate the purposes of the underlying substantive law; and (4) the costs of administration." (*Id.* at p. 473.)

In *Levi Strauss,* the court held only that fluid recovery might be appropriate in a consumer *class* action, noting that the parties did not dispute that fluid recovery methods could be employed in a Cartwright Act action. The

---

[17]Earlier, in *Blue Chip Stamps v. Superior Court* (1976) 18 Cal.3d 381 [134 Cal.Rptr. 393, 556 P.2d 755], the court held that the trial court had abused its discretion in ruling that a class action seeking refund of excess sales taxes collected on redemption of trading stamp books should be permitted notwithstanding the extremely small potential individual recovery (18 cents), the inability of most class members to establish their entitlement to recover, and the likelihood that few class members would make a claim. We rejected an argument that the action should be permitted because fluid recovery could be ordered in the form of reduction of future tax charges, reasoning that there was no correlation between those who paid the excess taxes and those who would benefit from a future reduction of the redemption price.

issue of whether fluid recovery was appropriate or permitted in actions other than class actions was not raised.

The court next addressed the propriety of fluid recovery in *Granberry v. Islay Investments, supra,* 9 Cal.4th 738. Again the context was a class action and we held that fluid recovery might be appropriate. There we noted the express statutory authority for fluid recovery in class actions found in Code of Civil Procedure section 384.

*Powers, supra,* 2 Cal.App.4th 330, and *Parkmerced, supra,* 198 Cal.App.3d 683, stand alone in approving fluid recovery in a UCL action that has not been certified as a class action. In *Powers,* a district attorney brought a UCL action seeking injunctive relief, restitution, and a civil penalty on the ground that the defendant violated a city ordinance by selling seven condominiums designated as moderate income housing at prices exceeding those allowed by the city's subdivision code. The complaint sought restitution, an order that the defendant disgorge its profits, and judgment requiring the defendant to replace the lost moderate income housing stock. The trial court granted the injunction, but believed it lacked power to order the other remedies. The Court of Appeal reversed, holding that the statutory remedies for unfair business practices contemplated the other forms of relief. It held that section 17203, like section 17535, authorizes orders for both restitution and dis-gorgement of profits, relying on *Fletcher* for its conclusion that these remedies were available to the court. (*Powers, supra,* at p. 340.) The court read *Fletcher* as authorizing orders for disgorgement of profits, not recog-nizing that *Fletcher* addressed the propriety of a class action or that *Fletcher* involved only restitution, not disgorgement of profits. The court held that ordering a fluid recovery remedy was an appropriate means of preventing the defendant from retaining the illegal profits. (*Powers, supra,* at p. 343.)

The *Powers* court relied also on *Parkmerced, supra,* 198 Cal.App.3d 683, where the court had affirmed a trial court judgment ordering defendant to refund security deposits to former tenants and to pay the refunds owed to tenants who could not be located to a residents' association. That court found authority for the order in Code of Civil Procedure section 1519.5. That section, an escheat provision of the Unclaimed Property Law, provides for escheat to the state of any sums held by a business association that have been ordered refunded but remain unclaimed by the owner after one year. It also provides that nothing in the section should be construed "to change the authority of a court or administrative agency to order equitable remedies." (Code Civ. Proc., § 1519.5.) The Court of Appeal read the latter provision

with sections 17200 and 17203 as a grant of equitable power to remedy unlawful business practices by means other than escheat of unclaimed property to the state. (*Parkmerced, supra,* 198 Cal.App.3d at p. 693.)

Notwithstanding the absence of legislative or other authority for the use of a fluid recovery remedy in a representative UCL action, the Court of Appeal here concluded that such orders are within the broad equitable powers of the court when deemed necessary to deter employment of unfair practices in the future.

The Legislature has authorized the court to enjoin present or proposed unfair business practices in section 17203. Orders for disgorgement may have deterrent force beyond that of injunctions coupled with restitutionary orders and in some cases might therefore be deemed "necessary to prevent the use or employment . . . of any practice which constitutes unfair competition." (§ 17203.) Nonetheless, reading section 17203 as permitting orders for disgorgement into a fluid recovery fund would be inconsistent with the Legislature's decision to expressly authorize fluid recovery in class actions and to provide that Consumers Legal Remedies Act (Civ. Code, § 1750 et seq.) suits on behalf of the plaintiff and other similarly situated consumers may be brought as class actions, not representative actions, while failing to authorize fluid recovery in representative UCL actions.

In sum, the Legislature has not expressly authorized monetary relief other than restitution in UCL actions, but has authorized disgorgement into a fluid recovery fund in class actions. Although the Legislature is well aware of the distinction between class actions and representative actions, it has not done so for representative UCL actions. Inasmuch as the Legislature has spoken, any further extension of the fluid recovery remedy should come from the Legislature, not, as the dissent argues, from this court. Therefore, we decline to read the grant of equitable power in section 17203 as encompassing the authority to fashion a fluid recovery remedy when the action has not been certified as class action. We cannot conclude that this is a proper exercise of the court's inherent equitable powers. Moreover, allowing fluid recovery in representative UCL actions might implicate the due process concerns raised by defendants here and noted by the Court of Appeal in *Bronco Wine Co., supra,* 214 Cal.App.3d at page 717. In addition, because a representative UCL action is not subject to the same level of judicial supervision as a class action, a UCL action seeking disgorgement into a fluid recovery fund on behalf of absent persons may not, in fact, serve the public.

For all of these reasons we conclude that section 17203 does not authorize orders for disgorgement into a fluid recovery fund.

To the extent that the trial court ordered defendants to make any refunds other than to refund money to tenants and former tenants, the award was not authorized by the UCL and was not a permissible exercise of the court's equitable powers. The judgment of the trial court for disgorgement of sums collected to secure liquidated damages may be enforced only to the extent that it compels restitution to those former tenants who timely appear to collect restitution. This does not mean, as the dissent asserts, that defendants may retain the funds improperly taken from their former tenants as liquidated damages. On remand the trial court should order defendants to identify, locate, and repay to each former tenant charged liquidated damages the full amount of funds improperly acquired from that tenant, retaining the power to supervise defendants' efforts, to ensure that all reasonable means are used to comply with the court's directives.[18]

If defendants have already made restitution to any claimant, defendants may introduce evidence of prior payment and need not pay any tenant twice, thus alleviating the due process concerns of defendants. As a practical matter the likelihood that any former tenants could successfully overcome a statute of limitations barrier and separately recover judgment against defendants is too remote to establish any denial of due process in these proceedings. In light of this conclusion, we need not address defendants' due process-based argument that UCL defendants must be accorded the protections against multiple suits and duplicative liability, protections available only in a class action. There has been no prejudice to defendants since, as we conclude below, that part of the judgment ordering restitution of the TIER fees must be reversed and the order for disgorgement of the liquidated damages/ security fees may be enforced only to the extent that it compels restitution to former tenants.

We note, moreover, that, because a UCL action is one in equity, in any case in which a defendant can demonstrate a potential for harm or show that the action is not one brought by a competent plaintiff for the benefit of injured parties, the court may decline to entertain the action as a representative suit. (*Fletcher, supra,* 23 Cal.3d at p. 454.) If the possibility of future suits exists, it may be appropriate for the court to condition payment of restitution to beneficiaries of a representative UCL action on execution of acknowledgment that the payment is in full settlement of claims against the

[18]Because an order to disgorge into a fluid recovery fund is not authorized in such representative UCL actions, the trial court may order the defendant to notify the absent persons on whose behalf the action is prosecuted of their right to make a claim for restitution, establish a reasonable time within which such claims must be made to the defendant, and retain jurisdiction to adjudicate any disputes over entitlement to and the amount of restitution to be paid.

defendant, thereby avoiding any potential for repetitive suits on behalf of the same persons or dual liability to them.

### III

#### CIVIL CODE SECTION 1950.5 AND DEFENDANTS' TIER FEES

Defendants contend that the TIER fee is not an unrefundable security fee prohibited by Civil Code section 1950.5. Civil Code section 1950.5 now provides in relevant part:

"(a) This section applies to security for a rental agreement for residential property that is used as the dwelling of the tenant.

"(b) As used in this section, 'security' means any payment, fee, deposit or charge, including, but not limited to, an advance payment of rent, used or to be used for any purpose, including, but not limited to, any of the following:

"(1) The compensation of a landlord for a tenant's default in the payment of rent.

"(2) The repair of damages to the premises, exclusive of ordinary wear and tear, caused by the tenant or by a guest or licensee of the tenant.

"(3) The cleaning of the premises upon termination of the tenancy.

"(4) To remedy future defaults by the tenant in any obligation under the rental agreement to restore, replace, or return personal property or appurtenances, exclusive of ordinary wear and tear, if the security deposit is authorized to be applied thereto by the rental agreement."

Subdivision (e) of Civil Code section 1950.5 provides that "[t]he landlord may claim of the security only those amounts as reasonably necessary for the purposes specified in subdivision (b). The landlord may not assert a claim against the tenant or the security for damages to the premises or any defective conditions that preexisted the tenancy, for ordinary wear and tear or the effects thereof, whether the wear and tear preexisted the tenancy or occurred during the tenancy, or for the cumulative effects of ordinary wear and tear occurring during any one or more tenancies."

When Civil Code section 1950.5 was enacted in 1977, and until a 1986 amendment (Stats. 1986, ch. 564, § 1, p. 1991), subdivision (e) limited use of a security fee to "such amounts as are reasonably necessary to remedy

tenant defaults in the payment of rent, to repair damages to the premises caused by the tenant, exclusive of ordinary wear and tear, or to clean such premises, if necessary, upon termination of the tenancy."

The $100 TIER fee was collected from every new tenant by Trinity Management Services, Inc. The fee is usually collected when the tenant signs a standard form lease. The lease imposes an obligation to pay the fee before occupying the premises. Upon payment the tenant receives a "Receipt and Agreement for Tenancy Initiation Expense Reimbursement" from the landlord.

Unlike the Court of Appeal here and in *Parkmerced*, we do not find subdivision (e) of Civil Code section 1950.5, which specifies the uses to which a security may be put by a landlord, useful in determining whether the TIER fee is a security. Subdivision (b) (set out, *ante*) defines the term and, while it provides that its examples of securities are not exclusive, it supports a conclusion that a security fee paid by a tenant to a landlord is an amount intended to offset expenses incurred by the landlord as a result of tenant conduct during the tenancy. It does not encompass the TIER fee that the trial court included in the restitution order made here.[19]

We begin, as we must, with the term "security." ▮ "We interpret statutory language according to its usual and ordinary import, keeping in mind the apparent purpose of the statute. (*Dyna-Med, Inc.* v. *Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1386-1387 [241 Cal.Rptr. 67, 743 P.2d 1323].) When no ambiguity appears, we give statutory terms their plain meaning. (*People* v. *Coronado* (1995) 12 Cal.4th 145, 151 [48 Cal.Rptr.2d 77, 906 P.2d 1232].)" (*Romano v. Rockwell Internat., Inc.* (1996) 14 Cal.4th 479, 493 [59 Cal.Rptr.2d 20, 926 P.2d 1114].)

Excluding meanings for the noun "security" that are irrelevant in this context, the term means "something given, deposited, or pledged to make certain the fulfillment of an obligation." (Webster's 9th New Collegiate Dict. (1989) p. 1062.) Every example of a security given in subdivision (b) of Civil Code section 1950.5 is consistent with this ordinary meaning of the word.

The parties and the *Parkmerced* court assume that because the TIER charge is a fee it must be a "security" within the definition of security given in subdivision (b) of Civil Code section 1950.5. It is apparent, however, that

---

[19]Civil Code section 1950.6, enacted in 1996 (Stats. 1996, ch. 525, § 1) now expressly permits a rental application screening fee "[n]otwithstanding Section 1950.5."

the Legislature included the terms "payment, fee, deposit or charge" in the definition to ensure that a landlord would not be able to use those or similar terms rather than "security" for a charge and thereby avoid the prohibition of nonrefundable securities and the limits placed on the use of a security by that statute. Application of the principle of *ejusdem generis* and consideration of the remainder of the statute compels that conclusion.

■ "*Ejusdem generis* applies whether specific words follow general words in a statute or vice versa. In either event, the general term or category is 'restricted to those things that are similar to those which are enumerated specifically.' " (*Harris v. Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1160, fn. 7 [278 Cal.Rptr. 614, 805 P.2d 873].) The canon presumes that if the Legislature intends a general word to be used in its unrestricted sense, it does not also offer as examples peculiar things or classes of things since those descriptions then would be surplusage. (See *Sears, Roebuck & Co. v. San Diego County Dist. Council of Carpenters* (1979) 25 Cal.3d 317, 331, fn. 10 [158 Cal.Rptr. 370, 599 P.2d 676].)

■ All of the examples of a security set forth in subdivision (b) of Civil Code section 1950.5 are charges intended to secure the landlord against future tenant defaults. Subdivision (e) specifies the only uses to which such fees may be put by the landlord, again confirming that the "fee, deposit, or charge" which may be a security within the subdivision (b) definition is one held by the landlord to ensure reimbursement for future tenant defaults. This is confirmed by section 1950.5, subdivision (d), which provides that the landlord holds a security for the tenant, by subdivision (f), which imposes a duty on the landlord to notify a tenant who has vacated the premises of the amount and disposition of the security and to return any remaining portion, and by subdivision (*l*), which prohibits a nonrefundable security.

Reading the statute as a whole thus confirms that even though a security is not limited to the examples set out in subdivision (b) of Civil Code section 1950.5, a security is limited to charges imposed to secure the landlord against future tenant defaults. A fee imposed at the outset of the tenancy to reimburse the landlord for expenses incurred for such purposes as providing application forms, listing, interviewing, screening the applicant, checking credit references, and similar purposes is not a security governed by the provisions of that section.[20]

---

[20]Having reached this conclusion, we need not address defendants' argument that Civil Code section 1950.5 is unconstitutionally vague, either on its face or in its application to

## IV

## DISPOSITION

The judgment of the Court of Appeal is reversed and the matter is remanded for further proceedings consistent with this opinion.

George, C. J., Mosk, J., Chin, J., and Brown, J., concurred.

**KENNARD, J.**—I concur in the majority opinion except for the following dictum discussing restitution by a defendant to nonparties in an action under Business and Professions Code section 17200 et seq., the unfair competition law (UCL): "If the possibility of future suits exists, it may be appropriate for the court to condition payment of restitution to [nonparty] beneficiaries of a representative UCL action on execution of acknowledgment that the payment is in full settlement of claims against the defendant, thereby avoiding any potential for repetitive suits on behalf of the same persons or dual liability to them." (Maj. opn., *ante*, at pp. 138-139.)

The majority's statement is dictum because, as the majority elsewhere recognizes (maj. opn., *ante*, at p. 138), there is no realistic possibility of repetitive suits by nonparties in this case. Its statement is imprudent because such details of case management are best left to the trial court and the parties in the first instance, rather than to an appellate court with its limited ability to foresee the course of future litigation and to create remedies in the abstract for potential problems that might or might not arise. Most importantly, the majority's proposal that a nonparty must give up whatever other *non*-UCL claims it may have in order to receive restitution for its UCL claims is on its merits dubious and unnecessary. No question of dual liability would arise from permitting a nonparty to receive UCL restitution in the first action and to bring a subsequent action on its non-UCL claims: to the extent UCL restitution already paid overlaps with damages suffered as a result of the non-UCL claims, the defendant would be entitled to credit in the subsequent action for the restitution already paid, just as it would be entitled to credit if the UCL and non-UCL claims were brought in a single action. Moreover, if a nonparty were required to bring a separate action on both its UCL and non-UCL claims to preserve its non-UCL claims, the nonparty could in the separate action prevent the defendant from contesting the merits of the UCL claim by invoking collateral estoppel, making the defendant's liability a foregone conclusion and the relitigation of the UCL claim a wasteful and pointless exercise.

defendants, or their claim that relitigation of the status of the TIER fee is barred by res judicata or collateral estoppel.

**WERDEGAR, J.,** Concurring and Dissenting.—I agree with the majority that Civil Code section 1950.5 does not apply to defendant landlords' nonrefundable security and administrative fees. (Maj. opn., *ante*, at pp. 121, 140-141.) I also agree that defendants have not been denied due process (*id.* at p. 140) and that the remedial order in this case, understood as foreclosing the possibility of double recovery by accommodating any evidence of prior payment, does not raise due process concerns (*id.* at p. 138). I dissent, however, from the majority opinion to the extent it holds the unfair competition law, Business and Professions Code[1] section 17200 et seq. (UCL), does not permit the trial court's order that defendants disgorge the proceeds of their illegal acts into a trust fund for the benefit of residential tenants in the affected jurisdiction, generally, as well as defendants' identifiable direct victims. (Maj. opn., *ante*, at pp. 121, 126-139.)

Reversing a unanimous Court of Appeal, the majority reasons, essentially, that "fluid recovery" is not authorized as a remedy in private UCL actions because it *is* authorized in class actions. I cannot join in such fallacious reasoning. The majority's conclusion, without support in the UCL's plain language, flies in the face of our previous pronouncements and lower court decisions in which the Legislature has for decades acquiesced. With its decision, the majority today permits the landlord defendants in this case to retain nearly half a million dollars in illegal gains from unfair competition, while significantly diminishing consumers' equitable and statutory protections against unfair business practices. This result is contrary to the legislative history, the language and the spirit of the UCL.

### Background

The trial court found that defendants, large residential landlords, for many years engaged in unfair and unlawful business practices by charging tenants in their approximately 2,000 San Francisco apartments fees and deposits that violated Civil Code sections 1950.5 (security for residential rentals) and 1671 (liquidated damages). These illegal business practices, the court found, "have been systematically carried out by [defendants] for many years, beginning well before April 1, 1990 and continuing unabated since then." Among other things, the trial court specifically found that, within the applicable four-year limitations period, defendants obtained illegal liquidated damages—sometimes as "security deposits"—in an average amount of $700 per tenant.

The trial court's remedial order permanently enjoined defendants from continuing their illegal practices. The trial court also ordered defendants to

---

[1]Except as otherwise noted, undesignated statutory references are to this code.

pay specific restitution, including restitution for illegal liquidated damages, in various amounts to various named plaintiffs. Additionally, the trial court ordered defendants to disgorge, to identifiable present and former tenants "who may, with due diligence, be found" and then to a trust fund, the proceeds of their illegal acts, including $448,000 corresponding to unlawful liquidated damages (plus interest). Finally, the court's order provides that any amounts paid as restitution to identified claimants shall be deducted from amounts required to be disgorged to the trust fund.

The trial court's order also provides that the trust fund created by defendants' disgorgement shall be administered "for the purpose of providing financial assistance for the advancement of legal rights and interests of residential tenants in the City and County of San Francisco." The trust fund is to be administered for the court by three trustees, one appointed by the San Francisco District Attorney, one by the Executive Director of the Bar Association of San Francisco, and the third by the other two. The trial court expressly retained jurisdiction over the parties and the subject matter "for the purpose of further proceedings to secure implementation and enforcement of the remedial and injunctive provisions of this judgment" and provided that "[t]he specific charter for the trust fund, as well as more specific criteria and arrangements for administering the fund and authorizing disbursements from it, shall be approved by the Court and shall be the subject of further proceedings."

Finally, the trial court ordered defendants to provide "written or published notice of this judgment, in a form and manner to be approved by the Court, to all current tenants and former tenants who rented and occupied defendants' apartments from or after April 6, 1990."

A unanimous Court of Appeal affirmed the trial court's judgment.

### *Discussion*

The majority does not dispute that defendants violated Civil Code section 1671 and the UCL by requiring tenants to pay illegal liquidated damages. Nor does the majority criticize the trial court's computations resulting in the corresponding disgorgement order. The majority holds, however, that the judgment of the trial court for disgorgement of sums collected to secure liquidated damages "may be enforced only to the extent that it compels restitution to those former tenants who timely appear to collect restitution." (Maj. opn., *ante*, at p. 138.) In support, the majority asserts that, to the extent the trial court ordered disgorgement to a fund benefiting San Francisco tenants, generally, "the award was not authorized by the UCL and was not a permissible exercise of the court's equitable powers." (*Ibid.*)

For the following reasons, I disagree.

*The UCL's language*

As the majority acknowledges, section 17203 "grants the court the power to make orders necessary to prevent the use of unfair business practices." (Maj. opn., *ante*, at p. 129.) Specifically, section 17203 expressly authorizes courts to "make such orders or judgments . . . as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, as defined in [the UCL], or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition." In my view, this language plainly authorizes the trial court's order in two ways— both as "necessary to prevent the use or employment" of unfair competition and as "necessary to restore to . . . person[s] in interest . . . money . . . which [defendants] . . . acquired by" unfair competition.

As it did in other parts of the UCL, the Legislature used the disjunctive in section 17203, authorizing orders "necessary to prevent . . . unfair competition . . . *or* as may be necessary to restore to any person in interest any money or property" (italics added), expressly thereby articulating two broad categories of permissible UCL remedies. Orders necessary to "prevent" future unfair competition and orders necessary to "restore" proceeds of past unfair competition are both authorized. (See *Stop Youth Addiction, Inc. v. Lucky Stores, Inc.* (1998) 17 Cal.4th 553, 561 [71 Cal.Rptr.2d 731, 950 P.2d 1086] (*Stop Youth Addiction*) [Legislature's use in section 17204 of the disjunctive when listing the entities empowered to bring UCL actions for relief " 'plainly suggests it meant to designate such entities in the alternative' "]; *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 180 [83 Cal.Rptr.2d 548, 973 P.2d 527] [as " 'section 17200 is written in the disjunctive, it establishes three varieties of unfair competition—acts or practices which are unlawful, or unfair, or fraudulent' "]; see generally *Reiter v. Sonotone Corp.* (1979) 442 U.S. 330, 339 [99 S.Ct. 2326, 2331, 60 L.Ed.2d 931] [canons of statutory construction "ordinarily suggest that terms connected by a disjunctive be given separate meanings"].)

The trial court's remedial order in this case amply satisfies each of section 17203's alternative remedial categories.

The trial court's order is "necessary to prevent" future unfair competition because, as we have recognized, an " 'injunction against future violations, while of some deterrent force, is only a partial remedy' " (*Fletcher v.*

*Security Pacific National Bank* (1979) 23 Cal.3d 442, 451 [153 Cal.Rptr. 28, 591 P.2d 51] (*Fletcher*)). Permitting defendants to retain any portion of their illicit profits would " 'impair the full impact of the deterrent force that is essential if adequate enforcement' " of the UCL is to be achieved. (*Ibid.*) In fact, the trial court's order would seem crafted for maximum preventive impact—directing, as it does, both that defendants fully disgorge the proceeds of their illegal acts and that any disgorged funds not returnable to defendants' reasonably identifiable direct victims be devoted, in trust and on appropriate terms, to the maintenance and defense of the legal rights and interests of the jurisdiction's residential tenants. (See *State of California v. Levi Strauss & Co.* (1986) 41 Cal.3d 460, 474 [224 Cal.Rptr. 605, 715 P.2d 564] (*Levi Strauss*) [under one form of fluid recovery, "uncollected funds are disbursed to a responsible governmental organization for use on projects that benefit noncollecting class members and promote the purposes of the underlying cause of action"].)

The trial court's order also is "necessary to restore" the proceeds of defendants' illegal acts to appropriate interested persons, i.e., defendants' present and former tenants, and tenants in the affected jurisdiction or their advocates. (See *Levi Strauss, supra,* 41 Cal.3d at p. 474; *Dean Witter Reynolds, Inc. v. Superior Court* (1989) 211 Cal.App.3d 758, 773 [259 Cal.Rptr. 789] [court in a UCL suit "is empowered to grant equitable relief, including restitution in favor of absent persons"]; *People v. Thomas Shelton Powers, M.D., Inc.* (1992) 2 Cal.App.4th 330, 343 [3 Cal.Rptr.2d 34] (*Powers*) [where compensating a direct victim is not possible, "the theory of fluid recovery permits an award of the funds to an interested third party"]; *People ex rel. Smith v. Parkmerced Co.* (1988) 198 Cal.App.3d 683, 693 [244 Cal.Rptr. 22] (*Parkmerced*) [nonparty residents' organization with "vested interest" in outcome was appropriate recipient of unclaimed remedial refunds in action to recover illegal rental fees].)

In creating a tenants' trust fund as a repository permitting full disgorgement to interested parties of defendants' illegal gains, the trial court invoked the concept of "fluid recovery"; it is this fluid recovery aspect of the trial court's order to which the majority objects. But "fluid recovery," as the majority acknowledges, is simply a term California courts have sometimes adopted when referring to " 'the application of the equitable doctrine of *cy près* in the context of a modern class action.' " (Maj. opn., *ante,* at p. 127; accord, *Levi Strauss, supra,* 41 Cal.3d at p. 472.) Interchangeably, we have used the term "fluid distribution." (See *Levi Strauss, supra,* at p. 474.)

The *cy près* doctrine originated in the common law of charitable trusts: "Where compliance with the literal terms of a charitable trust became

impossible, the funds would be put to 'the next best use,' in accord with the dominant charitable purposes of the donor." (*Levi Strauss, supra,* 41 Cal.3d at p. 472, citing *Estate of Tarrant* (1951) 38 Cal.2d 42, 49 [237 P.2d 505, 28 A.L.R.2d 419].) For over a century, California courts have applied the *cy près* doctrine to achieve remedial equity in a variety of contexts. (See, e.g., *Estate of Hinckley* (1881) 58 Cal. 457, 512 [declaring that "in the general devolution upon the Courts of this State of all judicial power, with respect to charities, is included in the power *cy près*"]; *Estate of Tarrant, supra,* at p. 49 [gift earmarked for nonexistent railway pension fund directed under *cy près* to nonprofit corporation benefiting railway employees]; *In re Morse* (1995) 11 Cal.4th 184, 210-212 [44 Cal.Rptr.2d 620, 900 P.2d 1170] [ordering that attorney who mass-mailed misleading advertisements about homesteading pay $170,000 "*cy près* restitution" to consumer protection prosecution trust fund].)

Amicus curiae, the California District Attorneys Association (District Attorneys), a statewide organization comprised of public officers charged with enforcing the UCL, explains that California courts for many years have used the *cy près* concept in ordering disgorgement of unlawfully obtained funds where direct compensation of victims cannot practically be effected. Taking a position diametrically opposed to the majority, the District Attorneys state that barring fluid disgorgement in private, uncertified UCL actions (as the majority does today) will undermine the UCL's function as "an efficient alternative to class actions as a means of addressing unlawful conduct through equitable remedies." As public prosecutors, the District Attorneys emphasize that private UCL enforcement is a vital supplement to their efforts against illegal business practices in this state.

Under existing precedent, the District Attorneys note, courts have discretion to require class-action-like procedures in particular UCL matters, although they are not required to do so. (See generally *Fletcher, supra,* 23 Cal.3d at p. 454; see also *Caro v. Procter & Gamble Co.* (1993) 18 Cal.App.4th 644, 660-661 [22 Cal.Rptr.2d 419].) UCL actions often are formally incompatible with class treatment, as class plaintiffs must be "truly representative of the absent, unnamed class members" (*Bartlett v. Hawaiian Village, Inc.* (1978) 87 Cal.App.3d 435, 438 [151 Cal.Rptr. 392]) while, in keeping with the UCL's broad remedial purposes, a private party has UCL standing regardless of whether he or she is directly aggrieved. (*Stop Youth Addiction, supra,* 17 Cal.4th at pp. 560-561; *Committee on Children's Television, Inc. v. General Foods Corp.* (1983) 35 Cal.3d 197, 211, 215 [197 Cal.Rptr. 783, 673 P.2d 660] (*Children's Television*).) The District Attorneys, therefore, quite understandably oppose any rigid restriction on fluid

recovery such as the majority announces today, because such a restriction will severely limit the remedies available in a critical class of UCL actions—those brought by personally unaggrieved plaintiffs.

Although this is not a publicly prosecuted UCL action and the majority does not state it would bar *cy près* or fluid recovery in such actions, one implication of the majority's construction of the UCL is to call into question the basis for these remedies in UCL actions generally. As the District Attorneys point out, section 17203, in describing permissible UCL remedies, draws no distinction between public and private actions. The District Attorneys emphasize, moreover, that complete disgorgement is a common remedial goal in publicly prosecuted UCL actions, as well as in private actions. In expressly construing the UCL to ban fluid recovery in private, uncertified UCL actions, therefore, the majority must accept responsibility for articulating a rationale that threatens to undermine public prosecutorial prerogatives as well.

I agree with the District Attorneys that we should retain a flexible construction of section 17203, permitting trial courts to countenance the full range of equitable and statutory UCL remedies, including in appropriate cases *cy près* fluid recovery, even absent class certification. The District Attorneys amply demonstrate that the deterrent effect of private UCL actions is an essential component of California's scheme for combating unfair competition. And, as we have understood for over 20 years, obtaining " 'the full impact of the deterrent force [of UCL remedies] is essential if adequate enforcement [of the law] is to be achieved. One requirement of such enforcement is a basic policy that those who have engaged in proscribed conduct surrender all profits flowing therefrom.' " (*Fletcher, supra,* 23 Cal.3d at p. 451, first brackets added; see also *Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1267 [10 Cal.Rptr.2d 538, 833 P.2d 545], superseded by statute on another point [Legislature considered UCL deterrence "so important that it authorized courts to order restitution without individualized proof of deception, reliance, and injury"].)

Contrary to the majority's apparent implication (see maj. opn., *ante,* at p. 127 & fn. 11), nothing in section 17203—or anywhere else in the UCL—suggests the Legislature's use of the phrase "any person in interest" (§ 17203) was intended to restrict a court's inherent equitable powers when crafting UCL remedies. As the majority points out, this language originated in the 1972 amendments to section 17535 and subsequently was added to the UCL. (Maj. opn., *ante,* at p. 131.) We previously have noted that "whenever the Legislature has acted to amend the UCL, it has done so only to *expand* its

scope, never to narrow it." (*Stop Youth Addiction, supra,* 17 Cal.4th at p. 570.) In describing one category of permissible UCL remedies, section 17203 refers generically to orders "necessary to restore" unfair competition proceeds, but notably does not employ the more specific term, "restitution." Thus, as the majority recognizes, an order that a defendant disgorge money obtained through an unfair business practice "may include a restitutionary element, but is not so limited." (Maj. opn., *ante,* at p. 127.)

Nor, contrary to the majority's apparent implication, does any statutory language constrict the UCL's "restorative" prong to "persons who had an ownership interest in the property." (Maj. opn., *ante,* at p. 127.) The majority cites several statutes, apparently meaning to suggest they illustrate the Legislature's use of the phrase "person in interest" in section 17203 was intended to limit UCL "restor[ation]" to direct return of ownership interests to identifiable owners. (See maj. opn., *ante,* at p. 127, fn. 11, citing § 17535 [false advertising remedies]; § 19214 [substandard insulation remedies]; Code Civ. Proc., § 873.810 [disbursement of partition sale proceeds]; *id.,* § 1235.125 [eminent domain]; Pub. Resources Code, § 25966 [gas appliance ignition devices].)

None of the majority's cited statutes mention the UCL or otherwise supports any narrowing of section 17203. In fact, we long ago construed the relevant language contrary to the majority's implication. (See, e.g., *Children's Television, supra,* 35 Cal.3d at p. 211 [if necessary for deterrence under § 17203 or § 17535, a "court may also order restitution without individualized proof of . . . injury"].) Business and Professions Code sections 17535 and 19214 and Public Resources Code section 25966 use broad remedial language substantially identical to that used in section 17203, but do not contain any qualifying language or provision supporting a narrow construction of that language, let alone the particular narrow construction at which the majority hints. Code of Civil Procedure sections 873.810 (partition of real property) and 1235.125 (defining "interest" in property as "right, title, or estate") each use the word "interest," but neither contains anything that suggests the Legislature meant to refer to interests outside those specialized statutory schemes. Code of Civil Procedure section 1235.125, in fact, is qualified expressly by a proviso that, unless the provision or context otherwise requires, "these definitions govern the construction of this title" (Code Civ. Proc., § 1235.110), i.e., the eminent domain law.

One Court of Appeal has remarked that it is "significant that the Legislature chose to use the word 'restore' in labeling that which an offending defendant may be ordered to do" (*Day v. AT & T Corp.* (1998) 63

Cal.App.4th 325, 338 [74 Cal.Rptr.2d 55]), as the choice indicates sections 17203 and 17535 do not contemplate purely punitive monetary sanctions. (See generally *Day*, *supra*, at pp. 338-339.) Even so, the same court recognized that these statutes and the cases construing them "allow[] for a fluid recovery, *as opposed to a restoration to identified individuals or classes*, [if] the amount being restored [is] objectively measurable as that amount which the defendant would not have received but for the unfairly competitive practice." (*Id.* at p. 339, italics added; *Levi Strauss*, *supra*, 41 Cal.3d 460; *Parkmerced*, *supra*, 198 Cal.App.3d 683.) The majority does not dispute that the amounts the trial court ordered disgorged in this case are objectively measurable as those that defendants would not have received but for their unfair practices.

Nor is the majority correct in assuming that, as a policy matter, "[w]hen restitution is made to a person in interest, fluid recovery is unnecessary." (Maj. opn., *ante*, at p. 129.) Appropriate interested parties may not be individually identifiable, or identifiable at the time disgorgement is ordered. (See, e.g., *Parkmerced*, *supra*, 198 Cal.App.3d at p. 693; *Powers*, *supra*, 2 Cal.App.4th at p. 343.) It is neither possible nor desirable that we attempt to prescribe in advance all of the circumstances that might justify designating appropriate interested parties by class or description. Rather, as an equitable device, " '[t]he propriety of Fluid Recovery in a particular case depends upon its usefulness in fulfilling the purposes of the underlying cause of action.' " (*Granberry v. Islay Investments* (1995) 9 Cal.4th 738, 750 [38 Cal.Rptr.2d 650, 889 P.2d 970].)

The majority also seems to suggest that, simply in specifying the remedy or relief available, section 17203 "thereby limit[s] the extent of equitable relief" courts may grant in UCL actions. (Maj. opn., *ante*, at p. 131, fn. 14.) Exactly what the majority means here by the "extent" of equitable relief is difficult to discern, but, in any event, the majority offers no authority for its novel suggestion. The majority also fails to explain how the Legislature's express authorization of "such orders . . . as may be necessary" (§ 17203) to deter unfair competition or restore its proceeds can, either linguistically or logically, be construed as a limit on courts' inherent equitable powers. "[W]hen the Legislature has desired to limit UCL remedies, it has 'expressly provided' (§ 17205) for such limitation" (*Stop Youth Addiction*, *supra*, 17 Cal.4th at p. 573), but section 17203 contains no such express limit. Nor does the UCL or any other statute contain an express limitation on *cy près* or fluid recovery. To the contrary, "the Legislature has clearly stated its intent that the remedies and penalties under the [UCL] are cumulative to other remedies and penalties." (*Manufacturers Life Ins. Co. v. Superior Court*

(1995) 10 Cal.4th 257, 284 [41 Cal.Rptr.2d 220, 895 P.2d 56], citing § 17205.)

As we previously have observed, "it is unlikely the Legislature, in providing courts with broad equitable powers to remedy violations under section 17203, intended those powers be limited in an illogical, unfair and counterproductive manner." (*ABC Internat. Traders, Inc. v. Matsushita Electric Corp.* (1997) 14 Cal.4th 1247, 1270 [61 Cal.Rptr.2d 112, 931 P.2d 290] (*ABC*).) Section 17203 does not "restrict the court's general equity jurisdiction 'in so many words, or by a necessary or inescapable inference.'" (*People v. Superior Court* [(*Jayhill Corp.*)] (1973) 9 Cal.3d 283, 286 [107 Cal.Rptr. 192, 507 P.2d 1400, 55 A.L.R.3d 191] (*Jayhill*) [discussing § 17535].) "In the absence of such a restriction a court of equity may exercise the full range of its inherent powers in order to accomplish complete justice between the parties, restoring if necessary the *status quo ante* as nearly as may be achieved." (*Ibid.*)

Thus, as we held in *Fletcher, supra,* 23 Cal.3d 442, which addressed the court's power to order restitution for false advertising under section 17535, and confirmed in *Children's Television, supra,* 35 Cal.3d 197, with regard to the substantially identical wording of section 17203, when seeking restitution on behalf of absent third parties, individualized proof of the injury to those absent persons is not required "if the court determines that such a remedy is necessary 'to prevent the use or employment' of the unfair practice" (*Fletcher, supra,* at p. 453; see also *Children's Television, supra,* at p. 211).

After all, in describing permissible UCL remedies, the Legislature emphasized not what may have been *taken* from victims of unfair competition, but what "money or property . . . may have been *acquired* by" (§ 17203, italics added) UCL violators. Such an emphasis suggests the Legislature intended that courts in UCL actions retain sufficient remedial flexibility to achieve complete disgorgement of unfair competition proceeds. In light of our previous pronouncements, the Court of Appeal unanimously so concluded, and I agree.

As we recently reaffirmed, under the UCL "as construed by this court and the Courts of Appeal, 'a private plaintiff who has himself suffered no injury at all may sue to obtain relief for others.'" (*Stop Youth Addiction, supra,* 17 Cal.4th at p. 561.) In my view, the UCL is clear and unambiguous in authorizing "any person" (§ 17204) to seek UCL remedies benefiting others, including any "orders or judgments . . . as may be necessary" (§ 17203) to

deter unfair competition or restore its proceeds to interested persons. The trial court's order in this case falls well within the plain language of these statutes. As the "plain language of the statute establishes what was intended by the Legislature," further judicial construction is not necessary to decide the case, and we "should not indulge in it." (*People v. Fuhrman* (1997) 16 Cal.4th 930, 937 [67 Cal.Rptr.2d 1, 941 P.2d 1189].)

*Legislative history*

Even while acknowledging its consonance with section 17203's plain language, the majority largely invalidates the trial court's remedial order in this case, asserting that "permitting orders for disgorgement into a fluid recovery fund would be inconsistent with the Legislature's decision to expressly authorize fluid recovery in class actions and to provide that Consumers Legal Remedies Act (Civ. Code, § 1750 et seq.) suits on behalf of the plaintiff and other similarly situated consumers may be brought as class actions, . . . while failing to authorize fluid recovery in representative UCL actions." (Maj. opn., *ante*, at p. 137; see also *id.* at p. 132, citing Code Civ. Proc., § 384.)

Any validity to the majority's legislative history argument is not self-evident, as there would be nothing logically inconsistent with the Legislature's intending, or our construing, the separate schemes governing class action residuals and disgorged unfair competition proceeds each to permit fluid recovery, or a *cy près* remedy. (Compare Code Civ. Proc., § 384, subd. (a) [Legislature's intent is that unpaid class action residuals shall be "distributed, to the extent possible, in a manner designed either to further the purposes of the underlying causes of action, or to promote justice for all Californians"] with Bus. & Prof. Code, § 17203 [authorizing "such orders or judgments" as "may be necessary" to deter unfair competition or to restore its proceeds to interested persons].)

Moreover, the premises of the majority's legislative history argument are flawed. First, the majority speaks of Code of Civil Procedure section 384 as having been enacted to "expressly authorize fluid recovery in class actions" (maj. opn., *ante*, at p. 132), but section 384 does not use the term "fluid recovery" at all. Rather, as noted, section 384 authorizes disbursement of class action residuals "in any manner the court determines is consistent with the objectives and purposes of the underlying cause of action." (§ 384, subd. (b).) Second, the majority accurately describes the Legislature as providing that certain Consumers Legal Remedies Act (CLRA) suits "*may* be brought as class actions" (maj. opn., *ante*, at p. 137, italics added), thus conceding

the CLRA contains no requirement of class treatment. The CLRA provides that any consumer entitled to bring a CLRA action "may, if the unlawful method, act, or practice has caused damage to other consumers similarly situated," seek the court's permission to proceed on behalf of a class. (Civ. Code, § 1781, subd. (a).) The CLRA directs courts to permit class treatment only "if all of [certain listed] conditions exist." (Civ. Code, § 1781, subd. (b) [listing traditional class action prerequisites].) That the Legislature has neither required class treatment of CLRA actions, nor specifically limited *cy près* or "fluid recovery" to class actions, fatally undermines the majority's legislative history argument to the extent it is premised on the contrary assumptions.

The majority's own authorities refute its legislative history argument. The Legislature stated when enacting the CLRA in 1970 that "[t]he provisions of this title are not exclusive" and "[t]he remedies provided . . . shall be in addition to any other procedures or remedies provided for in any other law." (Stats. 1970, ch. 1550, § 1, p. 3157; as amended, see now Civ. Code, § 1752.) In 1975 amendments, the Legislature clarified that, "[i]f any act or practice proscribed under [the CLRA] also constitutes a cause of action in common law or a violation of another statute, the consumer may assert such common law or statutory cause[s] of action under the procedures and with the remedies provided for in such law." (Stats. 1975, ch. 615, § 1, p. 1344; now Civ. Code, § 1752.) It follows that, contrary to the core rationale of the majority's legislative history argument, the Legislature did not intend, either when enacting or amending the CLRA, to displace *cy près*, fluid recovery, or any other statutory or common law procedure or remedy available in unfair competition actions.

In fact, all three of the statutes on which the majority relies for its core "inconsistency" rationale (see maj. opn., *ante*, at p. 137) provide that their remedies are cumulative and do not displace others. First, the UCL states unambiguously that, "[u]nless otherwise expressly provided, the remedies or penalties provided by [the UCL] are cumulative to each other and to the remedies or penalties available under all other laws of this state." (§ 17205.)[2] Second, as just discussed in detail, the CLRA sweepingly declares its

---

[2]Nowhere in any of the statutes cited by the majority is it "expressly provided" that UCL remedies are displaced or even limited. "The term ' "expressly" means "in an express manner; in direct or unmistakable terms; explicitly; definitely; directly." ' " (*Stop Youth Addiction, supra*, 17 Cal.4th at p. 573, citing Webster's New Internat. Dict. (3d ed. 1981) p. 803.) In order to conclude, as the majority states, that the mere existence of the CLRA and Code of Civil Procedure section 384 impliedly bars UCL fluid recovery, "we would have to read the word 'implicitly' into section 17205 or read the word 'expressly' out of it. Our office, of course, 'is simply to ascertain and declare' what is in the relevant statutes, 'not to insert what

provisions are "not exclusive" and are "in addition to any other procedures or remedies" in "any other law." (Civ. Code, § 1752.) Finally, albeit somewhat less broadly, Code of Civil Procedure section 384 declares it "shall not be construed to abrogate any equitable cy près remedy which may be available in any class action with regard to all or part of the residue." (Code Civ. Proc., § 384, subd. (d).)[3] Thus, the majority's attempt to justify its ipse dixit ban on UCL fluid recovery on the ground that the CLRA and Code of Civil Procedure section 384 somehow displace a court's traditional cy près or "fluid recovery" authority in the UCL context simply cannot be reconciled with the plain language of those statutes.

Finally, the majority's legislative history argument is contrary to the history of both the fluid recovery remedial device and that of the UCL.

The majority asserts that "[f]luid recovery in class actions was not authorized in this state until 1981" (maj. opn., ante, at p. 132, citing Bruno v. Superior Court (1981) 127 Cal.App.3d 120 [179 Cal.Rptr. 342]), but even if correct that is beside the point, where the issue is the validity of fluid recovery in nonclass UCL actions. As discussed, "fluid recovery" is simply cy près in the context of a modern class action (Levi Strauss, supra, 41 Cal.3d at p. 472) and, as we long have recognized, California courts' authority to utilize cy près was included "in the general devolution upon the Courts of this State of all judicial power . . . ." (Estate of Hinckley, supra, 58 Cal. at p. 512.) Thus, California courts have utilized the common law cy près doctrine for over a century and have for many decades fashioned "fluid" remedies, both in and out of the class action context.

This court itself employed a fluid recovery device, as the majority's own authority notes,[4] as early as 1946. In Market St. Ry. Co. v. Railroad Commission (1946) 28 Cal.2d 363 [171 P.2d 875] (Market St. Ry. Co.), not a class action, a fund of money was established representing overcharges made by a

has been omitted, or to omit what has been inserted.' " (Stop Youth Addiction, supra, at p. 573, quoting Code Civ. Proc., § 1858.) "We are not authorized to insert qualifying provisions not included, and may not rewrite the statute to conform to an assumed intention which does not appear from its language." (Stop Youth Addiction, supra, at p. 573.)

[3]That Code of Civil Procedure section 384, subdivision (d) expressly preserves cy près remedies only "in any class action" is not surprising given the section's exclusive focus on "the unpaid residuals in class action litigation." (Code Civ. Proc., § 384, subd. (a).) Nothing in the statute suggests the Legislature even imagined section 384 might be thought to displace equitable or statutory cy près outside the class action context. As we previously have noted, the Legislature has stated that its intent was just " 'to ensure that the unpaid residuals in class action litigation are distributed' " appropriately. (Granberry v. Islay Investments, supra, 9 Cal.4th at p. 751, citing Code Civ. Proc., § 384, subd. (a).)

[4]See majority opinion, ante, at page 127; Levi Strauss, supra, 41 Cal.3d at page 474.

street railway company. In staying a fare rollback ordered by the Railroad Commission, we had required the railway company to post a bond and deposit with the court certain securities against the need to make refunds in the event that we might ultimately affirm the Railroad Commission's decision. When few eligible patrons filed refund claims, we did not return the money to the railway company, but instead awarded it to the City of San Francisco which, having recently purchased the railway, would, we noted, use the funds for the benefit of railway patrons, generally. (*Id.* at pp. 371-373.) In ordering such distribution, we invoked our "power and the responsibility of protecting the fund and of disposing of it in accordance with the applicable principles of law and equity for the protection of the litigants and the public whose interests are affected by the final disposition thereof." (*Id.* at p. 367.) We also noted this court's freedom, "in the discharge of that duty and responsibility, to use broad discretion in the exercise of its powers so as to avoid an unlawful or unjust result." (*Ibid.*, citing *United States v. Morgan* (1939) 307 U.S. 183, 194 [59 S.Ct. 795, 801, 83 L.Ed. 1211].) In *Levi Strauss, supra,* 41 Cal.3d 460, we noted that *Market St. Ry. Co., supra,* 28 Cal.2d 363, "though not a class action, provides an example" of one "form of fluid distribution" (41 Cal.3d at p. 474), thus recognizing that fluid recovery, as a remedial device, is not necessarily confined to class actions.

*Levi Strauss* itself was brought as a class action by the Attorney General on behalf of persons overcharged by a clothing manufacturer. The parties entered into a settlement agreement that established a fund of money to be repaid to the relevant consumers, but many did not file claims and a substantial amount of money was left after legitimate claims had been paid. We noted that the equitable doctrine of *cy près* provided a solution. After considering various forms that "fluid recovery" might take—including division among individual claimants, distribution to an appropriate governmental organization and the creation of a consumer trust fund—we remanded the matter, noting that "trial courts should have the full range of alternatives at their disposal" and that "disposition of the residue on remand is a matter within the discretion of the trial court." (*Levi Strauss, supra,* 41 Cal.3d at p. 479.)

In *Parkmerced, supra,* 198 Cal.App.3d 683, a nonclass action pursuant to sections 17203 and 17206 seeking injunctive relief, civil penalties and reimbursement of illegal fees, remedial refunds due former tenants who could not be located were ordered turned over to a residents' association. The Court of Appeal upheld the order, thus permitting both restitution to identifiable direct victims and disgorgement to an interested third party. The

court declared that, while the residents' organization was not a party, "it took a continuing interest in the matter, assisted the district attorney in gathering pertinent information, and had a vested interest in its outcome. Refunding the unclaimed securities to the organization for its use in representing the interests of the Parkmerced tenants is an appropriate disposition of the penalty funds." (*Parkmerced, supra,* at p. 693.)

Applying both *Market St. Ry. Co., supra,* 28 Cal.2d 363, and *Levi Strauss, supra,* 41 Cal.3d 460, the Court of Appeal in *Powers, supra,* 2 Cal.App.4th 330, not a class action, held that the doctrine of fluid recovery permits a trial court in a UCL action to require disgorgement of unfair competition proceeds to a fund benefiting "an interested third party," there a governmental entity funding moderate-income housing. (*Id.* at pp. 339-344.) The court found "nothing in logic or in law supporting a theory that a wrongdoer should be entitled to retain its illegal profits simply because there is no cognizable direct victim" (*id.* at p. 341) and observed section 17203 "expressly entitles a court to take such actions as may be necessary to prevent the use by any person of any unfair business practice" (*Powers, supra,* at p. 340). Noting the deterrence rationale this court has discerned to underlie section 17203, the court, after reviewing fluid recovery cases, explained they "did not turn on the ability to name specific persons as victims, but on the equities of preventing the defendant from benefiting from the illegal transaction and of reversing the harm of the wrongful act to the greatest extent possible." (*Powers, supra,* at p. 343.)

At least partly on the basis of this history, it has long been regarded as settled that, under the UCL, "an individual acting for himself or the general public may bring the action and obtain equitable relief, including restitution in favor of absent persons, without certifying a class action." (11 Witkin, Summary of Cal. Law (1999 supp.) Equity, § 95, p. 359.)[5]

The majority asserts there is "nothing . . . in the legislative history of sections 17203 and 17535 to suggest that the Legislature intended to authorize fluid recovery in representative UCL actions when it made the power to order restitution statutory" (maj. opn., *ante,* at p. 132), but I disagree. As discussed above, California courts' authority to order *cy près* restitution (called "fluid recovery" in the class action context) long predated the Legislature's 1972 amendment of section 17535 and its subsequent parallel

---

[5]*Bronco Wine Co. v. Frank A. Logoluso Farms* (1989) 214 Cal.App.3d 699 [262 Cal.Rptr. 899] is no authority to the contrary. The Court of Appeal there expressly did not reach the issue of "whether it is proper to maintain an individual, representative action for unfair competition outside the confines of a class action." (*Id.* at p. 720.)

amendment of the UCL, and the majority acknowledges "the Legislature added express power to order restitution to section 17535 only to clarify the law." (Maj. opn., *ante*, at p. 132; see also *Fletcher, supra*, 23 Cal.3d at p. 453, fn. 6; *Jayhill, supra*, 9 Cal.3d at p. 287, fn. 1 [1972 amendments to § 17535 were "simply to clarify existing law"].)

That the Legislature did not in terms discuss "disgorgement to absent parties" or use the words "fluid recovery" or "*cy près* restitution" when enacting section 17203 (or in 1972, when amending § 17535), opting instead for a general description encompassing "such orders . . . as may be necessary" to deter or restore the fruits of unfair competition, does not imply it meant to deprive courts of these established powers. To the contrary, when a legislative body "entrusts to an equity court the enforcement of prohibitions contained in a regulatory enactment, it must be taken to have acted cognizant of the historic power of equity to provide complete relief in light of the statutory purposes." (*Mitchell v. DeMario Jewelry* (1960) 361 U.S. 288, 291-292 [80 S.Ct. 332, 335, 4 L.Ed.2d 323].)

Senate and Assembly legislative history sources respecting the 1972 amendments to section 17535 "indicate that the Legislature was concerned to affirm the 'general equity power' of the courts, particularly the power to order restitution." (*Dean Witter Reynolds, Inc. v. Superior Court, supra,* 211 Cal.App.3d at p. 774, citing Assem. Com. on Judiciary, Analysis of Assem. Bill No. 1763 (1972 Reg. Sess.) May 1, 1972; Sen. Com. on Judiciary, Analysis of Assem. Bill No. 1763 (1972 Reg. Sess.) undated.) As discussed, California courts' "general equity power," then as now, encompassed *cy près* and fluid remedies; accordingly, these contemporaneous legislative history documents plainly do not support—but, rather, refute—the majority's tortured attempt to demonstrate that, when the Legislature amended section 17535 and the UCL, concededly thereby "confirm[ing]" (maj. opn., *ante*, at p. 132) California courts' equitable powers, it somehow at the same time *restricted* those powers so as to foreclose full enforcement of orders, like the trial court's in the instant case, that employ such equitable devices.

Quite recently, we reaffirmed our general understanding that " ' "[t]he laws against unfair business practices were drafted in large part to prevent a wrongdoer from retaining the benefits of its illegal acts." ' " (*Stop Youth Addiction, supra,* 17 Cal.4th at p. 575, fn. 11, quoting *ABC, supra,* 14 Cal.4th at p. 1270.) The "general equity power" that the majority acknowledges is preserved by sections 17203 and 17535 has always included a "full range of . . . inherent powers . . . to accomplish complete justice between the parties, restoring if necessary the *status quo ante* as nearly as may be achieved" (*Jayhill, supra,* 9 Cal.3d at p. 286).

"It cannot be too often repeated that due respect for the political branches of our government requires us to interpret the laws in accordance with the expressed intention of the Legislature. 'This court has no power to rewrite the statute so as to make it conform to a presumed intention which is not expressed.'" (*California Teachers Assn. v. Governing Bd. of Rialto Unified School Dist.* (1997) 14 Cal.4th 627, 633 [59 Cal.Rptr.2d 671, 927 P.2d 1175].) The majority today transgresses that fundamental principle, judicially rewriting the UCL to include a partial ban on fluid recovery that the Legislature neither expressed nor intended.

### Due process

As noted at the outset, the majority holds that defendants have not been denied due process (maj. opn, *ante,* at p. 121) and that the remedial order in this case, understood as foreclosing the possibility of double recovery by accommodating any evidence of prior payment, does not raise due process concerns (*id.* at p. 138). I agree. In reaching these conclusions, however, the majority repeatedly alludes to "the due process concerns of defendants" (maj. opn., *ante,* at p. 138; see also *id.* at pp. 121, 125, 137), at one point opining in dictum that "allowing fluid recovery in representative UCL actions might implicate the due process concerns raised by defendants here and noted by the Court of Appeal in *Bronco Wine Co.* [*v. Frank A. Logoluso Farms*], *supra,* 214 Cal.App.3d at page 717]" (maj. opn., *ante,* at p. 137). As the majority explains, defendants have argued that UCL fluid recovery (both in the trial court's order in this case and generally) creates a risk of "multiple suits and duplicative liability," adequate protections against which are, according to defendants, "available only in a class action." (Maj. opn., *ante,* at p. 138.)

For several reasons, I disagree that UCL fluid recovery (either in this case or generally) creates for defendants a risk either of oppressive litigation or of being forced to pay more than once for a single injury.

Initially, I agree with Justice Kennard that repetitive suits by nonparties in this case is not a realistic possibility. (Conc. opn. of Kennard, J., *ante,* at p. 142.) Were the court to enforce the trial court's disgorgement order (minus its provisions respecting "Tenant Initiation Expense Reimbursement" or TIER fees), and were a former tenant not a party to this action subsequently to sue under the UCL based on defendants' actions between April 1990 and

April 1994,[6] no court entertaining such an action could award additional disgorgement because, by virtue of the judgment in this case, defendants would have given up all their ill-gotten gains and, as a matter of law, would have nothing left to disgorge.[7] Nor, were such a potential future plaintiff to restrict her remedial plea to restitution of amounts she herself paid, would the suit threaten doubly to penalize defendants, as in such a case the plaintiff would be referred to the previously established fluid recovery fund for reimbursement as eligible. Neither scenario implicates due process, either for defendants or plaintiffs.

The majority does not suggest there would be any due process problem if, after issuance of a particular UCL fluid recovery order, a subsequent plaintiff, before the statute of limitations had run, commenced and prosecuted to judgment a claim based on the same conduct by the defendant and recovered in that subsequent action other or greater remedies for other or greater injuries than were redressed or proven in the former action. Nor would there be a due process problem to the extent such a plaintiff's actual recovery in the second action might (on the defendant's application or the court's own motion) appropriately be fashioned to account for availability of remedies established in the first action (such as restitution from a fluid recovery fund) for the same injuries.

In UCL actions, generally, remedial fluid recovery funds necessarily are governed by section 17203; therefore, a court may, in administering any fluid recovery scheme, "make such orders or judgments . . . as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition . . . or as may be necessary to restore to any person in interest any money or property . . . which may have been acquired" thereby. (§ 17203.) As previously noted, we recently reaffirmed that section 17203 "provid[es] courts with broad equitable powers" (*ABC, supra,* 14 Cal.4th at p. 1270) to fashion flexible UCL remedies.

Thus, in UCL actions seeking fluid recovery, as in all UCL actions, a court has power and authority to fashion a constitutional remedy. For example, as discussed, a trial court has discretion, in the exercise of its broad equitable powers under the UCL, in an appropriate case to require class action procedures, or to require advance notice to nonparties. The majority does not dispute a trial court's equitable power *not* to award fluid recovery in

---

[6]The period covered by the applicable four-year statute of limitations in this suit filed on April 6, 1994, and for which the trial court calculated its remedial order.

[7]See also concurring opinion of Kennard, J., *ante,* at page 142, explaining that "to the extent UCL restitution already paid overlaps with damages suffered as a result of the non-UCL claims, the defendant would be entitled to credit in [a] subsequent action . . . ."

particular cases, or to award it on terms designedly protective of constitutional rights. Nothing in the UCL—or any other statute, so far as I am aware—prevents a defendant from insisting upon, or a court in the exercise of the "full range" of its equitable powers from ordering, controls and procedures that ensure against any risk of double disgorgement. (See generally *ABC, supra,* 14 Cal.4th at p. 1269; *Jayhill, supra,* 9 Cal.3d at p. 286.)

In actions that may arise subsequent to a UCL fluid recovery order, just as California courts are served by legal and equitable principles empowering them to craft remedies in light of relief previously awarded, so too they are bound by others forbidding them to permit any kind of double recovery. (See, e.g., *City of Moorpark v. Superior Court* (1998) 18 Cal.4th 1143, 1158 [77 Cal.Rptr.2d 445, 959 P.2d 752] [citing the rule that "employees who settle their claims for lost wages and work benefits as part of a [Labor Code] section 132a proceeding could not recover these damages as part of a subsequent FEHA proceeding" as an example of how "equitable principles preclude double recovery for employees"]; *Richards v. Owens-Illinois, Inc.* (1997) 14 Cal.4th 985, 994 [60 Cal.Rptr.2d 103, 928 P.2d 1181] [to prevent double recovery, damages awarded employee in trial against third party tortfeasors must be reduced by amount of workers compensation benefits received]; *Lazar v. Superior Court* (1996) 12 Cal.4th 631, 638 [49 Cal.Rptr.2d 377, 909 P.2d 981] [invoking "the rule against double recovery of tort and contract compensatory damages"].)

Accordingly, in UCL actions generally, the trial court plainly possesses authority and discretion to fashion fluid recovery orders that achieve the UCL's remedial purposes while assuring fundamental fairness to the parties.

In this case, the fluid recovery fund should be governed by the trial court's order creating it. As the majority concedes, the likelihood that any former tenant could presently overcome a statute of limitations barrier and separately recover against defendants is remote. (Maj. opn., *ante,* at p. 138.) Thus, the possibility of such actions poses no practical due process threat. In any event, to the extent unresolved claims exist of which we are not apprised (which seems unlikely in view of defendants' presumed interest in bringing such to our attention), their resolution would be governed by the principles set forth above and, as I have explained, this court is in a position to remind the lower courts of their power and obligation to fashion and administer UCL remedies in accordance with due process and general equitable considerations.

Even to the extent any theoretical risk remains of future duplicative suits, however, no practical possibility exists of double disgorgement. The fluid

recovery fund created by the trial court would be "administered as a trust fund for the purpose of providing financial assistance for the advancement of legal rights and interests of residential tenants in the City and County of San Francisco," but only after 90 days' due diligence is conducted and restitution is made to plaintiffs and other former tenants found thereby. The court ordered restitution payments to be deducted "from the amount required for disgorgement," and reserved all issues concerning award of attorney fees and costs. Finally, the court retained jurisdiction over the parties and the subject matter of the action for the purpose of further proceedings to secure implementation and enforcement of its remedial order.

In light of the fluid recovery order's numerous express provisions for continuing court oversight and administration, I conclude that the trial court, exercising its "broad equitable powers" (*ABC*, *supra*, 14 Cal.4th at p. 1270) to fashion fair and effective UCL remedies, crafted a specific fluid remedy that constitutes no substantial threat to defendants' due process rights. In the event unanticipated complications were to arise and threaten either party's rights, the court could adjust the terms of the order and the administration of the trust fund to accommodate the circumstances. It was in order to retain such flexibility, presumably, that the trial court retained jurisdiction over the fund and provided that "[t]he specific charter for the trust fund, as well as more specific criteria and arrangements for administering the fund and authorizing disbursements from it, shall be approved by the Court and shall be the subject of further proceedings."

For the foregoing reasons, I reject any suggestion that UCL fluid recovery inherently poses due process concerns.

What the majority accomplishes today is judicial legislation, plain and simple. Proposals for limiting UCL recovery to individuals directly harmed (after the fashion of the majority opinion), or for otherwise circumscribing UCL actions, repeatedly have been rejected by the Legislature.[8] No matter— the majority today fiats judicially what the UCL's detractors long have sought, and been denied, legislatively.

---

[8]See Anderson, *Complaining More Efficiently*, San Francisco Daily Journal (Sept. 16, 1999) page 1 (noting that for years "state business groups have pushed unsuccessfully for legislation to make it more difficult for plaintiffs to pursue unfair business practice claims" [*id.* at p. 9] and describing the repeated failure of bills to require class certification in UCL actions or more narrowly define "unfair competition"). A recent attempt by UCL opponents to legislate such limits, Assembly Bill No. 2186 (1999-2000 Reg. Sess.), was defeated in the Assembly Judiciary Committee. (See Bridge, *Tort Reformers Try Hard, but Odds Are Long*, S.F. Recorder (May 3, 2000) p. 1.) One observer called Assembly Bill No. 2186 "the Legislature's likeliest candidate for failure" should it return. (*Id.* at p. 12.)

The trial court ordered defendant landlords to disgorge $448,000 (plus interest) in liquidated damages they illegally collected while leasing apartments over four years, but the majority today declines to enforce that order except to the extent any money disgorged is paid as restitution to identified former tenants. The trial court's order identifies $2,255 in illegal proceeds payable as such. The difference is $445,745, plus interest. That this court should reach out, contrary to plain statutory language, legislative history and longstanding judicial precedent in which our Legislature consistently has acquiesced, so as to permit defendants to retain these ill-gotten gains, is regrettable.

Our task is not to favor or disfavor the UCL, but to effectuate the intent of the Legislature. In this case, the trial court's order directing disgorgement of defendants' illegal profits did just that. I would reverse the judgment of the Court of Appeal and remand the cause for further proceedings consistent with the foregoing.

Appellants' petition for a rehearing was denied July 19, 2000.