66 Cal.Rptr.3d 744 (2007)
155 Cal.App.4th 1342
Brian REID, Plaintiff and Appellant,
v.
GOOGLE, INC., Defendant and Respondent.
No. H029602.
Court of Appeal of California, Sixth District.
October 4, 2007.
*747 Duane Morris, Barry L. Bunshoft, Ray L. Wong, Paul J. Killion, Lorraine P. Ocheltree, Eden Anderson, San Francisco, for Plaintiff and Appellant Brian Reid.
Wilson Sonsini Goodrich & Rosati, Fred W. Alvarez, Marina C. Tstalis, Gary M. Gansle, Marvin Dunson III, Palo Alto, Attorneys for Defendant and Respondent Google, Inc.
RUSHING, P.J.
Plaintiff Brian Reid was employed by defendant Google, Inc. (Google) from June *748 2002 until April 2004 when Reid was terminated. Reid was 54 at the time. Following his termination, Reid filed a lawsuit against Google for unfair business practices under California's Unfair Competition Law (UCL) (Bus. & Prof.Code, § 17200 et seq.), based on Google's alleged discriminatory hiring practices. Reid also asserts causes of action for disparate treatment under California's Fair Employment and Housing Act (FEHA) (Gov.Code, § 12900 et seq.), wrongful termination, failure to prevent discrimination, and emotional distress.
On Google's motion, the trial court struck Reid's UCL claims based on the provisions of Proposition 64. In addition, the court granted Google's motion for summary judgment as to the remaining claims.
On appeal, Reid asserts the trial court erred in striking his allegations of unlawful hiring and promotion claims from his complaint, and in granting Google's motion for summary judgment as to the remaining causes of action in his complaint.

STATEMENT OF THE FACTS AND CASE
Reid, age 52 at the time, was hired by Google in June 2002 as Director of Operations and Director of Engineering. Reid is a PhD. in Computer Science and a former Associate Professor in Electrical Engineering at Stanford University.
The other high level employees with whom Reid dealt while at Google were CEO (Chief Executive Officer) Eric Schmidt, age 47, Vice President of Engineering Wayne Rosing, age 55, Urs Hoelzle, age 38, and founders Sergey Brin, age 28, and Larry Page, age 29. Rosing made the decision to hire Reid, and Reid reported to Rosing, and Hoelzle at times throughout his employment at Google.
In Reid's only written performance review while employed at Google, Rosing described Reid as having "an extraordinarily broad range of knowledge concerning Operations, Engineering in general and an aptitude and orientation towards operational and IT issues," be "project[s] confidence when dealing with fast changing situations," "has an excellent attitude about what `OPS' and `Support' mean," is "very intelligent," "creative," "a problem solver," and that the "vast majority of Ops run great." Reid was given a performance rating indicating he "consistently [met] expectations." From February 2003 to February 2004, Reid received bonuses including 12,750 stock options.
Reid's performance review also contained the following statement by Rosing: "Adapting to the Google culture is the primary task for the first year here.... [¶] ... [¶] Right or wrong, Google is simply different: Younger contributors, inexperienced first line managers, and the super fast pace are just a few examples of the environment." When Reid was later terminated, he was told by Rosing that he was not a "cultural fit."
While Reid was employed at Google, he was subject to age-related derogatory comments by employees. For example, Hoelzle told Reid his opinions and ideas were "obsolete," and "too old to matter." Hoelzle told Reid he was "slow," "fuzzy," "sluggish," "lethargic," did not "display a sense of urgency," and "lack[ed] energy." Hoelzle made age related comments to Reid "every few weeks...."
Reid was also subject to derogatory comments from colleagues within the organization, who referred to Reid as an "old man," an "old guy," an "old fuddy-duddy." They told him his knowledge was ancient, and joked that the CD jewel case office placard should be an "LP" instead of a "CD."
On October 13, 2004, Rosing removed Reid from the Director of Operations position *749 and removed his responsibilities and reports as Director of Engineering. Rosing's decision to move Reid into the position and remove the Director of Operations was instigated by Hoelzle. Although Reid was permitted to retain his title as Director of Engineering, Reid was moved into a new role at Google to develop and implement a new program aimed at retaining engineers by enabling them to obtain a Master's Degree in Engineering by attending courses taught by Carnegie Melon University Professors at Google. CEO Schmidt assured Reid that the graduate degree program was important and that the work on it would require another five years. Reid was not given a budget or a staff to support the graduate program.
When Reid was moved into the graduate program, Hoelzle, 15 years younger than Reid, took over his responsibilities as Director of Operations, and Douglas Merrill, 20 years younger than Reid, assumed Reid's other duties.
In January 2004, Brin, Page, Rosing and Hoelzle made a collective decision to pay Reid a zero bonus for his work done in 2003. Meanwhile, Schmidt sent an e-mail to Rosing asking for "a proposal from [him] ... on getting [Reid] out...." In Rosing's response to Schmidt, Rosing expressed concern about the group's decision regarding Reid's bonus, stating he was "having second thoughts about the full zero out of the $14K bonus [versus] treating it consistent with all similarly situated performers." Rosing instead determined that Reid should receive a bonus of $11,300, in addition to some other suggested terms of a severance agreement, to avoid a "judge concluding we acted harshly...."
On February 13, 2004, Rosing met with Reid and told him he was not a "cultural fit," and there was no longer a place for him in the Engineering Department. Reid asked Rosing who made the decision to terminate him, and specifically asked if Larry Page made the decision and Rosing nodded in a manner indicating a "yes." Rosing encouraged Reid to apply for positions with other departments. Google maintains that Rosing told Reid that the in-house graduate program was being eliminated, and that was the reason for his termination. However, Reid disputes this, and maintains that he was not told any reason for his termination other than lack of "cultural fit," and he believed the graduate program would continue.
E-mails among various employees of Google show that there was no intention of hiring Reid in another department after he was removed from engineering. Shona Brown, Vice President of Business Operations wrote: "you should make sure I am appropriately prepped. My line at the moment is that there is no role for him in the HR organization." She later wrote: "we should probably get me clear on this before tomorrow." HR Director Sullivan sent an email to Rosing and Brown stating, "Seems [Reid's] first interest is to continue his work on the college programs he's been working on. He'll explore that option first with both of you." Sullivan continued: "I propose [Brown] ... meets with [Reid] this Tues. and lets him know there's no role [for him] in her org ... I've talked with [Chief Financial Officer (CFO) George] Reyes live, he will not have an option for Brian ... this is The Company Decision." Sullivan also wrote: "We'll all agree on the job elimination angle...."
Ten days after he was terminated from engineering, Reid met with CFO George Reyes, who told him there was no position in his department. Reid then met with Brown, who also stated there were no positions for him in her department, and told him there were no openings for Reid *750 because he was not a "cultural fit" at Google.
Reid turned in his access card on February 27, 2004, and no longer returned to Google. Pursuant to a severance package, Reid was paid salary and health benefits, and his stock options continued to vest until April 20, 2004.
Reid filed suit against Google on July 24, 2004. The original complaint alleged 10 causes of action. Reid subsequently filed an amended complaint alleging two additional causes of action. The causes of action were (1) UCL violations related to Google's discrimination based on age; (2) age discrimination under FEHA; (3) disability discrimination under FEHA; (4) wrongful termination in violation of public policy; (5) failure to prevent discrimination; (6) negligent infliction of emotional distress; (7) intentional infliction of emotional distress; (8) fraud in the inducement; (9) violation of California Labor Code section 201; (10) violation of the California Labor Code section 203; (11) breach of an implied contract for long term employment and payment of a guaranteed bonus amount; and (12) breach of the implied covenant of good faith and fair dealing. Reid sought injunctive relief, disgorgement of profits, restitution of lost stock options, and attorney fees and costs.
Google demurred to Reid's sixth, eighth, eleventh and twelfth causes of action, and filed a motion to strike certain allegations related to Reid's UCL and breach of implied contract claims. The trial court sustained the demurrer to Reid's eighth causes of action for fraud in the inducement. The court panted Google's motion to strike the allegations regarding implied contract for long term employment, and the allegations regarding Google's discriminatory hiring and promotion practices. The court also struck Reid's prayer for relief to recover lost stock options as restitution under the UCL.
Google then filed a motion for summary judgment as to the remaining claims, and the trial court granted the motion. Judgment was entered, and Reid filed a timely notice of appeal.
With regard to the summary judgment, Reid appeals the order granting judgment as to the UCL claims in the first cause of action; disparate treatment and impact claims in the second cause of action; wrongful termination in violation of public policy in the fourth cause of action; failure to prevent discrimination in the fifth cause of action; negligent infliction of emotional distress in the sixth cause of action; and intentional infliction of emotional distress in the seventh cause of action.

DISCUSSION
Reid appeals (1) the order striking the unlawful and unfair hiring and promotion practices allegations from his UCL claim in the fist cause of action, and this UCL prayer for restitution of lost stock options; (2) the trial court's order denying discovery of Google applicant data; and (3) the order granting summary judgment as to the first, second, fourth, fifth, sixth, and seventh causes of action.

Motion to Strike Reid's UCL Claims Related to Hiring and Promotion
On appeal, Reid asserts the trial court erred by applying the provisions of Proposition 64 retroactively, and striking the UCL claims related to unfair hiring and promotion from his complaint.
Proposition 64 was passed by the voters of California in 2004, and changed the UCL provisions to prohibit attorneys "from filing lawsuits for unfair competition where they have no client who has been injured in fact" by the alleged practice. *751 Reid's lawsuit in this case was filed before Proposition 64 was passed. Google filed a motion to strike the UCL provisions of Reid's complaint using Proposition 64 as support, and asserting the Reid was not harmed by Google's hiring practices, because he was never hired and did not seek a promotion by Google. The trial court granted the motion, and struck the unfair hiring and promotion claims under the UCL from Reid's complaint.
At the time this case was filed in our court, the California Supreme Court was considering the issue of whether Proposition 64 could be applied to cases currently pending. On July 24, 2006, the Supreme Court answered that question in the affirmative. (See Californians for Disability Rights v. Mervyn's, LLC, (2006) 39 Cal.4th 223, 46 Cal.Rptr.3d 57,138 P.3d 207.)
We review the trial court's grant of Google's motion to strike under the deferential abuse of discretion standard. (Tostevin v. Douglas (1958) 160 Cal.App.2d 321, 331, 325 P.2d 130.) Here, Reid suffered no injury by Google's hiring and promotion practices. By Reid's own admission, he was hired by Google the only time he ever applied for employment. The basis of his claim, that Reid spoke with some Vice Presidents at Google about securing another position at Google when he was terminated does not qualify as a rejected application for employment. (See, e.g., Ibarbia v. Regents of University of California (1987) 191 Cal.App.3d 1318, 1328, 237 Cal. Rptr. 92.) In addition, Reid never applied for a promotion at Google. We find the trial court did not abuse its discretion in granting Google's motion to strike the unfair hiring and promotion claims under the UCL in Reid's complaint.
Because Reid did not suffer any injury as a result of Google's hiring or promotion practices, he lacks standing to assert these claims under the UCL. As such, the trial court did not abuse its discretion in granting Google's motion to strike the UCL claims related to hiring and promotion.[1]
Motion to Strike Prayer for Restitution Under the UCL
Reid asserts the trial court erred in striking his prayer for restitution under the UCL, and specifically asserts he should have the right to seek the unvested stock options that he had at the time of his termination from Google.
As to the causes of action under the unfair competition law, while restitution is available under the UCL without individualized proof of the impact, the law does not contemplate recovery for individuals who were not in some way deprived of money or property by means of defendant's unfair competition. (See Korea Supply Co. v. Lockheed Martin Corp. (2003) 29 Cal.4th 1134, 1148, 131 Cal. Rptr.2d 29, 63 P.3d 937 (Korea Supply Co.); Kraus v. Trinity Management Services, Inc. (2000) 23 Cal.4th 116, 126-127, 96 Cal.Rptr.2d 485, 999 P.2d 718 (Kraus).) Specifically, a defendant may be compelled to return "money obtained through an unfair business practice to those persons in interest from whom the property was taken, that is, to persons who had an ownership interest in the property...." (Kraus, supra, 23 Cal.4th at pp. 126-127, 96 Cal. Rptr.2d 485, 999 P.2d 718.)
*752 Reid seeks return of unvested stock options from the time he was terminated. However, unvested stock options are not owned by the option holder. In In re Marriage of Walker (1989) 216 Cal.App.3d 644, 647, 265 Cal.Rptr. 32, the court noted that when an at-will employee (like Reid) is terminated prior to vesting, his stock options are subject to forfeiture, because the options are only earned after they have vested.
Here, Reid's stock options were not earned at the time; of his termination, because they had not yet vested. Reid at most had an expectancy interest in the options, however, such interest does not constitute ownership for the purpose of restitution. (See, e.g., Korea Supply Co., supra, 29 Cal.4th at pp. 1149-1150, 131 Cal.Rptr.2d 29, 63 P.3d 937.)
We are not persuaded by Reid's reliance on In re Marriage of Hug (1984) 154 Cal. App.3d 780, 201 Cal.Rptr. 676 (Hug) for the premise that in some circumstances unvested stock options are owned by the optionee. Hug is inapplicable here, because its holding was specifically limited to marital dissolution actions in which a spouse had unvested stock options at the time of dissolution. The Hug court held that because some of the time needed to vest the options passed during the marriage, and the husband was still employed with the company and had an expectation of vesting at the time of dissolution, fairness required that the wife share in the interest of the options. (Id. at p. 790, 201 Cal.Rptr. 676.)
Because an ownership interest is required in order to seek restitution under the UCL, and Reid had no ownership interest in his unvested stock options, the trial court was correct in striking the claim for restitution under the UCL.

Age Discrimination Claims
The FEHA prohibits an employer from discriminating on the basis of age. (Gov.Code, § 12940.) In California, courts employ the three-prong test that was established in McDonnell Douglas Corp. v. Green (1973) 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (McDonnell Douglas) to resolve discrimination claims, including age discrimination. (Guz v. Bechtel National Inc. (2000) 24 Cal.4th 317, 354, 100 Cal.Rptr.2d 352, 8 P.3d 1089.) First, the employee must establish a prima facie case of discrimination. (Id. at p. 354, 100 Cal. Rptr.2d 352, 8 P.3d 1089.) The employee "`"must at least show actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were `based on a [prohibited] discriminatory criterion.'"'" (Id, at p. 355, 100 Cal.Rptr.2d 352, 8 P.3d 1089.) Thus the employee must establish: "(1) he was a member of a protected class, (2) he was qualified for the position he sought or was performing competently in the position he held, (3) he suffered an adverse employment action, such as termination, demotion, or denial of an available job, and (4) some other circumstance suggests discriminatory motive." (Ibid.) Once the employee satisfies this burden, there is a presumption of discrimination, and the burden then shifts to the employer to show that its action was motivated by legitimate, nondiscriminatory reasons. (Id. at pp. 355-356, 100 Cal. Rptr.2d 352, 8 P.3d 1089.) A reason is "`legitimate'" if it is "facially unrelated to a prohibited bias, and which if true, would preclude a finding of discrimination." (Id. at p. 358, 100 Cal.Rptr.2d 352, 8 P.3d 1089.) If the employer meets this burden, the employee then must show that the employer's reasons are pretexts for discrimination, or produce other evidence of intentional discrimination. (Id, at "p. 356, 100 Cal.Rptr.2d 352, 8 P.3d 1089.)
*753 Although the three part test for pretext stated above appears to be the law in discrimination cases, as we said in Reeves v. Safeway Stores, Inc. (2004) 121 Cal. App.4th 95, 16 Cal.Rptr.3d 717 (Reeves), the "frequent misconstruction" of the McDonnell Douglas decision has "led too many courts to replace basic principles of procedure, evidence, and logic with elaborate and essentially arbitrary obstacles to relief." (Id. at p. Ill, fn. 11, 16 Cal. Rptr.3d 717.) "Foremost among these is the notion, which pervades innumerable decisions, that on summary judgment in a case of this kind, the `ultimate issue' is `pretext.'" (Ibid., quoting Hugley v. Art Institute of Chicago (N.D.Ill.1998) 3 F.Supp.2d 900, 906, fn. 7.)
In the employment context, a finding of discriminatory motive may be reached without ever finding that the cited reason was "pretextual," because the "ultimate issue" is what really happened, not whether one of the parties is lying about it. If an employer offers an innocent reason for his actions and there is no evidence to the contrary, then he is entitled to summary judgment. But if there is evidence to the contrary, the question of pretext is at best incidental; the issue is whether his conduct was in fact motivated entirely by the stated reason or whether discriminatory animus was a but-for cause of that conduct.

Summary Judgment in Age Discrimination Cases
When an employer brings a motion for summary judgment in an age discrimination case, and the employer "presents admissible evidence either that one or more of plaintiffs prima facie elements is lacking, or that the adverse employment action was based on legitimate, nondiscriminatory factors, the employer will be entitled to summary judgment unless the plaintiff produces admissible evidence which raises a triable issue of fact material to the defendant's showing." (Caldwell v. Paramount Unified School Dist. (1995) 41 Cal.App.4th 189, 203, 48 Cal.Rptr.2d 448.) Once the employer meets its burden in the summary judgment motion, "the employee must demonstrate a triable issue by producing substantial evidence that the employer's stated reasons were untrue or pretextual, or that the employer acted with a discriminatory animus, such that a reasonable trier of fact could conclude that the employer engaged in intentional discrimination or other unlawful action." (Cucuzza v. City of Santa Clara (2002) 104 Cal.App.4th 1031, 1038, 128 Cal.Rptr.2d 660 (Cucuzza).)
"Appellate review of a ruling on a summary judgment or summary adjudication motion is de novo." (Brassinga v. City of Mountain View (1998) 66 Cal.App.4th 195, 210, 77 Cal.Rptr.2d 660.)
In this case, the trial court granted defendant's summary judgment motion as to all remaining causes of action, finding that Google's evidence while "not sufficient to prove that Plaintiff cannot establish a prima facie case of age discrimination," "it is sufficient to prove that [Google] had a legitimate nondiscriminatory reasons for ... terminating [plaintiffs] employment in February 2004." The court went on to find Reid's evidence was "not sufficient to raise a permissible inference that in fact, [Google] considered Plaintiffs age as a motivating factor in ... terminating his employment." The court noted that because Reid had failed to raise a triable issue of material fact as to pretext, his other attendant claims should be dismissed.
Reid challenges the trial court's dismissal of his first, second, fourth, sixth and *754 seventh causes of action.[2]
We note that there is undisputed evidence to support both a prima facie case of age discrimination, as well as a legitimate basis for Reid's termination. Specifically, Reid was a member of a protected class, in that he was 54 years old at the time of his termination; he was performing competently in the position he held, both in the Operations and Engineering Departments, and as head of the newly created graduate program; he suffered an adverse employment action of termination; and other circumstance suggests age discrimination as a motive in Google's action. Google establishes a legitimate, nondiscriminatory reason for the termination as elimination of the graduate program, and therefore, job elimination.
In his appeal, Reid attempts to raise a triable issue of material fact as to pretext in his termination. "[T]he issue of pretext does not address the correctness or desirability of reasons offered for employment decisions. Rather, it addresses the issue of whether the employer honestly believes in the reasons it offers. [Citation.]" (McCoy v. WGN Continental Broadcasting Co. (7th Cir.1992) 957 F.2d 368, 373.) The employee's rebuttal obligation is not satisfied where "the employee simply show[s] the employer's decision was wrong, mistaken, or unwise." (Horn v. Cushman & Wakefield Western, Inc. (1999) 72 Cal.App.4th 798, 807, 85 Cal. Rptr.2d 459 (Horn).) "[T]he employee `"`must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence,' [citation], and hence infer "that the employer did not act for the [... asserted] nondiscriminatory reasons."'"'" (Morgan v. Regents of the University of California (2000) 88 Cal.App.4th 52, 75, 105 Cal. Rptr.2d 652.)
Here, Reid asserts a combination of evidence serves to create a triable issue of material fact that Google's stated reason of job elimination for his termination was pretextual, such that a rational finder of fact could find the reason unworthy of credence. Reid offers statistical evidence of discrimination at Google, discriminatory comments made by coworkers as well as decision makers, Reid's demotion to a nonviable position before his termination, and Google's changed rationales for Reid's termination.

Statistical Evidence of Discrimination
Reid presented statistical evidence of Google's practices through the declaration of Professor Norman Matloff, a statistician with 30 years experience in the field. Matloff evaluated data for 1,718 employees in Google's Operations and Engineering Departments, focusing on dates of birth, quarterly and yearly numerical performance ratings, bonus amounts, job position, educational degrees and salary. Matloff did not analyze termination practices within this group because, according to Reid, there was only a small number of employees who were involuntarily terminated to date, because Google was such a new company at the time.
As part of his analysis, Matloff performed a series of multiple regression analyses to determine whether there was any relationship between the age of Google employees, the performance ratings they were assigned, and the bonus amounts *755 they received.[3] Matloff looked for disparity in performance ratings, as well as bonus amount that could be traced to age, as opposed to any other variable.
Matloff analyzed director-level employees in the Operations and Engineering Department, and reported that he observed a statistically significant negative correlation between age and performance rating. Specifically, for every 10 year increase in age, there was a corresponding decrease in performance rating. The sample size for this finding was 23.
In addition to limiting the analysis to director-level employees, Matloff also analyzed the effect of age on performance ratings for all 1,718 employees of the Operations and Engineering Department. For this group, Matloff found a highly statistically significant negative correlation between age and performance rating.
With regard to an employee's bonus amount, Matloff performed a regression analysis of director-level employees, finding a statistically significant negative correlation between age and bonus. Matloff found a 29 percent decrease in bonus amount related to every 10 year increase in age. The sample size for this analysis was 18.[4]
Google challenges the statistical evidence offered by Reid on numerous grounds, including Matloff's methodology, and sample sizes analyzed. In its order, the trial court issued a ruling pursuant to Biljac Assoc. v. First Interstate Bank (1990) 218 Gal.App.3d 1410, 1419-1429, 267 Cal.Rptr. 819 (Biljac), declining to rule on the specific evidentiary objections, instead opting to rely only on "competent and admissible evidence." (Ibid.)
With regard to the trial court's duty when presented with objections to evidence in the summary judgment context, the weight of current authority is contrary to the holding in Biljac, and seems to agree that (1) the trial court is obligated to rule expressly on all objections, and (2) the court's failure to do so may effect a "waiver" of objections, so that they are not preserved for appellate review. This view appears to have grown out of the statutory command that the trial court "consider all of the evidence set forth in the papers, except that to which objections have been made and sustained by the court...." (Code Civ. Proc, § 437c, subd. (c), italics added.)
However, we believe the Biljac decision was substantially correct, and was surely more nearly correct than its critics have been. Indeed, based on Biljac, in the absence of express rulings by the trial court, as in the present case, we presume either that the trial court ruled correctly on evidentiary objections, or that the court overruled all objections it did not expressly sustain.
Contrary to the assumption indulged by a number of courts, the language of Code Civil Procedure section 437c, subdivision (c) does not mandate express rulings. Rather, it reinforces the requirement of express objections by directing the court to consider all evidence, objectionable or not, unless it finds that a meritorious objection has in fact been made. But nowhere is the court commanded to issue an explicit ruling. Moreover, *756 even if the statute could be read to impose such a requirement, it does not mandate that in the absence of express rulings the underlying objections are forfeited on appeal. The fact is that when a party properly brings an objection to the trial court's attentioni.e., when he files it in proper formhe has done everything he can or should be required to do to bring about a ruling. The fact that a trial court does not expressly rule on such objection should not be interpreted as a waiver of the party's objection.
The analysis of waiver of evidentiary objections becomes clearer when viewed in the context of appellate review of evidentiary objections asserted during trial. When an objection is made during the examination of a witness, the examination of the witness cannot proceed until the trial court acts on the objection. The most common action is for the trial court to say "sustained" or "overruled," which of course constitutes a clear ruling and preserves the issue for appeal. But if the court fails to make that express statement, we would still consider the issue preserved on appeal. This follows directly from Evidence Code section 353, which provides that an objection is preserved for appeal if it is sufficient in form; there is no requirement that the objection be expressly ruled upon.
Moreover, the lack of an express ruling on an objection in the trial context does not necessitate our finding that no ruling was actually made. For example, if the court permitted the witness to answer, we would find the court impliedly overruled the objection. We would infer the opposite that the court sustained the objection if the court instructed the witness not to answer, told the questioner to proceed to his next question, or struck any answer the witness had already given. We would not deem the lack of an express ruling on an objection as a forfeiture of the objection on appeal.
The trial practice circumstance most nearly analogous to the court's procedure in a summary judgment motion is that in which the court permits a party to adduce evidence over his opponent's objection, while reserving a ruling on the admissibility of the evidence. In such a case, if the court neglects to expressly rule on the objection, it is presumed to have overruled it and admitted the challenged matter into evidence. (Clopton v. Clapton (1912) 162 Cal. 27, 32, 121 P. 720; 3 Witkin, Cal. Evidence (4th ed. 2000) Presentation at Trial, § 387, p. 480; see People v. Flores (1979) 92 Cal.App.3d 461, 466, 154 Cal. Rptr. 851; People v. Jacobs (1987) 195 Cal.App.3d 1636, 1651, 241 Cal.Rptr. 550.)
In our view, this is the simplest and soundest approach in the present context. If a party lodges otherwise proper objections to evidence, and the court does not rule on those objections at the hearing, the court should be viewed as having reserved a ruling on the objections. Its later failure to issue an express ruling effects an implied overruling of all objections, which are therefore preserved for appeal. The entire record is thus presumptively before the appellate court, and the burden is on the objecting party to show that evidence presumptively considered by the trial court should instead be disregarded in determining the propriety of the order on the merits.
We are not persuaded by the notion that we must have evidentiary rulings so that we know what evidence was actually taken into account by the trial court. It does not matter what evidence was taken into account. What matters is what evidence should have been taken into account, and whether the order under reviewgranting or denying summary judgmentcan be *757 sustained in light of that evidence, coupled with the governing substantive law.
In addition, we do not believe that express rulings are necessary to enable the reviewing court to adequately respect the deferential standard of review governing discretionary rulings. While it is true that a trial court enjoys varying amounts of discretion in making some types of evidentiary rulings, many such rulings are not discretionary in the slightest. No court has discretion to admit hearsay evidence, or expert opinion by an unqualified witness, or testimony manifestly lacking any foundation in personal knowledge, over proper objection. Even where an objection is of a type usually invoking the trial court's discretionary powers, the deferential standards of review should have limited scope as applied in the present context. Because summary judgment is decided entirely on the papers, and presents only a question of law, it affords very few occasions, if any, for truly discretionary rulings on questions of evidence. Nor is the trial court often, if ever, in a better position than a reviewing court to weigh the discretionary factors. In our view, all reasonable doubts about the admissibility of evidence, like doubts on other aspects of the motion, must be resolved in favor of the party opposing summary judgment.
Express trial court rulings on a summary judgment motion would not necessarily make the appellate process any surer, fairer, or more efficient. Insofar as an evidentiary issue is potentially dispositive of a party's right to summary judgment, that issue is virtually certain to be reexamined on appeal under an independent judgment standard. This means that we will analyze the issue in exactly the same way, and reach exactly the same result, no matter what the trial court did.
Here, Google filed proper objections to the statistical evidence offered by Reid that the trial court did not expressly rule upon. We infer from the lack of an express ruling on the objections that the trial court impliedly overruled them, and considered the evidence when ruling on the summary judgment. And, we may consider the issue of the admissibility of the statistical evidence on appeal because we do not find the lack of a ruling creates waiver.
Statistical evidence is clearly admissible in the present case. An employee such as Reid may produce statistical evidence regarding an employer's practices to show that the challenged action is consistent with a pattern of discrimination. (McDonnell Douglas, supra, 411 U.S. at pp. 804-805, 93 S.Ct. 1817.) Statistical evidence is relevant if it demonstrates a disparity in treatment and can eliminate any nondiscriminatory explanations for the disparity, such as legitimate selection criteria or chance. (Barnes v. GenCorp., Inc. (6th Cir.1990) 896 F.2d 1457,1466.)
Here, based on our inference from the lack of an express ruling, we find the trial court was correct in considering the statistical evidence when deciding the motion for summary judgment. Despite considering the statistical evidence, however, the court clearly erred when it determined that there was no triable issue of material fact arising from that evidence. Importantly, Google does not offer conflicting expert testimony to dispute Reid's statistical findings; rather, Google's counsel offers arguments about why the findings are not sound. Such argument goes to the weight of the statistical evidence, a task reserved for a jury, not a court on summary judgment.
In a similar case, the court reversed a grant of summary judgment because the statistical evidence presented a triable issue of material fact. In Maitland v. Univ. *758 of Minn. (8th Cir.1998) 155 F.3d 1013, 1017, the parties disputed whether there was inequity in salaries among men and women employed by the university. On summary judgment, the defendant argued the plaintiff had not included enough variables in its statistical regression analysis to sufficiently demonstrate salary disparity. On appeal, the court reversed the grant of summary judgment in favor of defendant, holding that the probative value of the statistical evidence and whether sufficient variables were used in the regression analysis was a jury question. The court stated: "[I]f a regression analysis omits variables, it is for the finder of fact to consider the variables that have been left out of an analysis, and the reasons given for the omissions, and then to determine the weight to accord the study's results...." (Ibid.)
Similarly, while Google makes numerous arguments about why Reid's statistical evidence does not demonstrate age discrimination, it does not offer contrary evidence to dispute the statistics. In other words, although Google argues the sample sizes were too small in this case, for example, it does not offer a contrary expert opinion of why the small size would affect the results. Moreover, Matloff attested to the fact that his findings were both "highly statistically significant" with regard to performance evaluations as related to age, as well as "statistically significant" with regard to bonus amounts related to age. As such, Google's argument that the sample sizes are too small does not refute Reid's evidence; rather it demonstrates the existence of a triable issue of fact on the weight that should be given to the statistical data. (See Barnes v. GenCorp, Inc., supra, 896 F.2d at p. 1467 [in which the court stated: "plaintiffs' expert has asserted that the statistical pool is sufficient in size to render the results statistically reliable. At best the defendants' unsubstantiated assertion [that the sample size was too small] raises a question that cannot be resolved on this record"].)
Similarly, any question about the validity of the statistical evidence in this case, and what it suggests, is clearly a question of the weight of the evidence and is the province of the jury. Google does little more than lob attacks at the evidence with nothing to substantiate its ` assertions. (See, e.g., Capaci v. Katz Besthoff, Inc. (5th Cir.1983) 711 F.2d 647, 653-654["[t]he defendant must do more than raise theoretical objections to the data or statistical approach taken; instead, the defendant should demonstrate how the errors affect the results"].)

Discriminatory Atmosphere at Google
Reid asserts that a general "youthful" atmosphere at Google, including employees participating in recreational activities like hockey, football and skiing demonstrate the environment was biased toward older workers.
In addition, Reid asserts that certain ageist comments were made both by key decision makers, as well as coworkers, that demonstrate discrimination.
Reid provides examples of statements made regarding his age, such as Hoelzle telling Reid he was "slow," "fuzzy," "sluggish," and "lethargic." Hoelzle also told Reid his ideas were "obsolete," and "too old to matter." Reid asserts Hoelzle instigated his removal from operations and participated in the termination decision.
In addition, Reid offers statements made by coworkers referring to him as an "old man" and an "old fuddy-duddy," and joked that his office placard should be as "LP" instead of a "CD."
*759 When Reid was terminated from employment, he was told twice by Rosing that he was not a "cultural fit" at Google.
Google argues at length that the comments Reid offers were stray remarks that do not raise a triable issue of fact as to pretext. The so-called "stray remarks" rule allows courts to deem racist or sexist remarks insufficient to support denial of summary judgment if the remarks are considered "stray." We cannot view such a rule as anything other than the assumption by the court of a factfinding role.[5]
We do not agree with suggestions that a "single, isolated discriminatory comment" (Gagne v. Northwestern Nat. Ins. Co. (6th Cir.1989) 881 F.2d 309, 314-316), or comments that are "unrelated to the decisional process" are "stray" and therefore, insufficient to avoid summary judgment. (Smith v. Firestone Tire and Rubber Co. (7th Cir.1989) 875 F.2d 1325, 1330.) There are certainly cases that in the context of the evidence as a whole, the remarks at issue provide such weak evidence that a verdict resting on them cannot be sustained. But such judgments must be made on a case-by-case basis in light of the entire record, and on summary judgment the sole question is whether they support an inference that the employer's action was motivated by discriminatory animus. Their "weight" as evidence cannot enter into the question.
Here, in addition to providing evidence of ageist remarks directed towards him, Reid also provides statistical evidence of discrimination (discussed above). In cases with similar evidence, federal courts have determined a triable issue of fact of pretext exists. For example, in Greene v. Safeway Stores, Inc. (10th Cir.1996) 98 F.3d 554, 561, the court held that a supervisor's comment that the employee "`didn't fit in with the new culture,'" coupled with the employee's statistical evidence that older workers were being replaced with younger ones, was sufficient to raise a triable issue of fact. Similarly, in Hayes v. Compass Group USA Inc. (D.Conn.2004) 343 F.Supp.2d 112, 120, the court found a triable issue where the employee produced evidence that his supervisor said he was "`old school,'" and commented that the managerial style of another over-40 manager was "`very slow to change,'" and the manager needed to "`move into the nineties.' " The Hayes court concluded that the remarks coupled with the other indicia of discrimination demonstrated by statistical evidence was sufficient to raise a triable issue of fact.

Reid's Change of Position within Google
In addition to the statistical evidence and comments of coworkers and supervisors as evidence of pretext, Reid also asserts his demotion from Director of Operations and Director of Engineering, to head of Google's graduate program that was eliminated shortly thereafter is also evidence of pretext.
Reid offers evidence that his new position of head of the graduate program had no title and no job description. Reid was not given a budget or staff. Four months after Reid was placed in the position, Google terminated the program.
*760 Reid asserts that his change in position at Google and the abrupt termination of the program, coupled with his statistical evidence and evidence of agesist comments creates a triable issue of fact as to pretext.
In a case with similar facts, the Federal Court of Appeal for the Third Circuit reversed a grant of summary judgment. In Torre v. Casio, Inc. (3rd Cir.1994) 42 F.3d 825 (Torre), the plaintiff was hired by Casio when he was over 50 as a regional sales manager. Casio then moved him to a newly created position of "`product marketing manager,'" and abruptly eliminated the position one month later. (Id. at p. 827.) Torre asserted the termination was pretext for Casio's true motive, which was to replace him with a younger worker. Torre offered evidence of the change in position subsequent elimination, as well as ageist comments to demonstrate pretext. In addition, Torre demonstrated that when he was moved into the new position, two younger employees, aged 41 and 28 took over his responsibilities of the former position, while when he was terminated from the new position, no one filled the position. (Id. at p. 831.)
The facts of Torre are strikingly similar to the current case. Here, like Torre, Reid was hired when he: was in his 50's for a certain position. After serving in that position, Reid, like Torre, was moved into a newly created position, and was terminated shortly thereafter. When Reid was moved into the new position, he, like Torre was replaced by two younger workers, Urs Hoelzle, age 38 and Douglas Merrill, age 33, who assumed the duties of Director of Operations. Finally, when Reid was terminated from his position as head of the graduate program, he, like Torre, was not replaced.
In Torre, the court reversed the district court's grant of summary judgment in favor of Casio on its assessment that judgment as a matter of law was improper, because "the district court ... resolved a host of material fact issues in concluding that Torre had failed to rebut Casio's proffered explanations for the transfer and termination." The court further concluded: "[t]he district court essentially accepted Casio's explanations in their entirety and failed to address a significant amount of the evidence presented by Torre." (Torre, supra, 42 F.3d at p. 833.)
Here, we see little difference between the district court in Torre and the trial court in this case. In granting summary judgment in favor of Google, the trial court resolved a number of factual issues in dispute, such as the weight and value of Reid's statistical evidence, the validity and weight of the ageist comments made by decision makers in Reid's demotion and termination, and whether the newly created position of head of Google's graduate program was in fact a way-station for Reid's ultimate termination. These evidentiary evaluations are clearly the purview of the jury, and not the decision of the trial court on summary judgment.

Google's Changed Rationales for Reid's Termination
Finally, Reid offers evidence that Google changed its rationales for terminating him, further demonstrating pretext.
When there is evidence that an employer's reasons for termination have altered over time, there is "strong grounds" for opposing summary judgment. (Washington v. Garrett (9th Cir.1994) 10 F.3d 1421,1434; see also Santiago-Ramos v. Centennial P.R. Wireless Corp. (1st Cir. 2000) 217 F.3d 46, 56 [the court reversed a grant of summary judgment on the ground that the employee was not told of the reason for her termination when it occurred, but the company sited performance *761 deficiencies after the fact when it became concerned the employee might file suit].)
Here, Reid asserts there is evidence that Google changed its stated reasons for his termination sufficient to create a triable issue of fact as to pretext. For example, Reid offers evidence that when he was terminated on February 13, 2004, he was not told the graduate program was being discontinued. Rather, Reid was told that he was being discharged because he lacked "cultural fit" with Google, and was assured the graduate program was being continued and his termination was not performance based. Reid asserts Google raised performance issues as a basis for Reid's termination for the first time in its motion for summary judgment. In addition, Google also added job elimination as a basis for the termination on its assertion that Rosing told Reid at their February 13, 2004 meeting that the graduate degree program was being eliminated.
By our evaluation, the question of whether Google changed its position on the reasons for Reid's termination is clearly disputed. Most notable is the distinct difference in Reid's version of the February meeting, during which he asserts he was told he was not a cultural fit, but that the graduate program would continue, and Rosing's version of the meeting, in which he asserts he told Reid the program was being eliminated.
In addition, Google's claim that Reid was terminated for poor performance is also disputed. Reid asserts that at the time he was terminated, he was never informed that it was based on poor performance. Moreover, Google admitted in discovery that Reid's termination was "not performance related." Reid asserts that he was told by Schmidt at the time he was terminated that it was not performance based.
The conflicting evidence that Google's stated reasons for Reid's termination changed after Reid was terminated, coupled with Reid's statistical evidence, evidence of agesist comments, and demotion create a triable issue of fact as to pretext.

Inference Against Discrimination
Google argues it is entitled to an inference against discrimination, because the evidence shows that the only person responsible for Reid's termination was Rosing, who was over 50 at the time. (West v. Bechtel Corp. (2002) 96 Cal. App.4th 966, 117 Cal.Rptr.2d 647.) Specifically, Google asserts that because Rosing was responsible for both hiring and firing Reid within a short period of time, and therefore, there is a "strong inference" that there was no discriminatory motive. (Id. at pp. 980-81, 117 Cal.Rptr.2d 647.) We take Google's invitation to be no more than an attempt to use persuasive evidence as a guise for undisputed evidence. The argument that Rosing, over 50 years of age, would not discriminate against another person over 50 years old may prove effective (or not) in closing argument before a jury, but it is not an inference we will make on summary judgment.
Although Google is correct in its assertion regarding Bechtel, and the inference against discrimination, it is incorrect in asserting that there is undisputed evidence that Rosing was solely responsible for Reid's hiring and termination. Reid provides significant evidence that others in the company, including Page, Hoelzle and Schmidt were involved in the decisions.
For example, Reid offers evidence that Rosing represented to him that Larry Page made the decision that he should be removed from the Engineering Department. Reid also offers evidence that Hoelzle acted as Reid's direct supervisor for a *762 period of time, evaluating his job performance, and with Page, participated in the decision to pay Reid a zero bonus in February 2004. In addition, Reid provides evidence that Schmidt sent an e-mail to Rosing directing him to put together a "proposal for getting [Reid] out...."
Google asserts differing interpretations of the evidence stated above, such as its argument that Page was only involved in the decision to offer Reid a zero bonus in 2004, not to terminate him, and that Schmidt's direction to get Reid out was only a request that Rosing put together a severance package to offer to Reid upon termination.
We do not believe, as Google asserts that the evidence is undisputed that Rosing was the sole decision maker in Reid's termination. Reid offers evidence that creates a triable issue of fact as to whether there were additional players, such as Page, Hoelzle and Schmidt. Therefore, Google is not entitled to an inference of no discrimination.
We conclude that Reid produced sufficient evidence that Google's reasons for terminating him were untrue or pretextual, and that Google acted with discriminatory motive such that a factfinder would conclude Google engaged in age discrimination. Accordingly, the trial court erred in granting summary judgment as to the first, second, fourth, fifth, sixth and seventh causes of action.

DISPOSITION
The trial court's grant of Google's motion to strike the hiring and promotion allegations in Reid's UCL claim, as well as Reid's prayer for restitution under the UCL is affirmed. The trial court's grant of Google's summary judgment motion as to Reid's UCL claims in the first cause of action and the remaining claims in the second, fourth, fifth, sixth, seventh causes of action is reversed.
WE CONCUR: PREMO and ELLA, JJ.
NOTES
[1] Because we deem the motion to strike the hiring and promotion allegations in Reid's UCL claim properly granted in this case, we need not consider Reid's additional arguments" that the trial court erred by denying his motion to compel discovery of Google's hiring practice data. (See Reid's opening brief at page 20: "If this Court reverses the trial court's motion to strike Reid's UCL claim, Reid raises an additional claim of error relating to discovery.")
[2] Reid does not challenge the dismissal of his third, ninth, tenth, eleventh, and twelfth causes of action on appeal.
[3] Reid describes multiple regression analysis as a measurement of the influence of independent variables such as salary, performance ratings, age, etc., on a dependent variable such as bonus amount.
[4] Reid submits that the reason the sample size is smaller than in the performance rating analysis is that Google did not provide full bonus data for all the Director-level employees.
[5] The point is illustrated in Horn, supra 72 Cal.App.4th 798, 809, 85 Cal.Rptr.2d 459, where the court wrote that an isolated and ambiguous comment "was at most a `stray' ageist remark and is entitled to virtually no weight in considering whether the firing was pretextual or whether the decisionmaker harbored discriminatory animus." (Italics added.) This statement is all the more remarkable because the opinion elsewhere acknowledges that on summary judgment, "weighing of the evidence" is "prohibited." (Id. at p. 807, 85 Cal.Rptr.2d 459.)